

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-30-1996

# Rankin v. Desarno

Precedential or Non-Precedential:

Docket 95-3007,95-3011,95-3037

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"Rankin v. Desarno" (1996). *1996 Decisions.* Paper 134.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/134

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

```
              IN THE UNITED STATES COURT OF APPEALS
                    FOR THE THIRD CIRCUIT
                       _____

                       NO. 95-3007
                       _____


                LAURA RANKIN; DAVID RANKIN;
               STACY JOHNSON; ALICE BONACCI,

                                          Appellants,



                             v.


             SAMUEL M. DESARNO; ALICE DESARNO;
                  COUNTY OF ALLEGHENY; PENN
                   HILLS SCHOOL DISTRICT

                     GARY J. GAERTNER,

                                          Trustee


                          COUNTY OF ALLEGHENY and
                          PENN HILLS SCHOOL DISTRICT,

                             Appellants.


                       _____

                       NO. 95-3037
                       _____


                LAURA RANKIN; DAVID RANKIN;
                STACY JOHNSON; ALICE BONACCI

                             v.


             SAMUEL M. DESARNO; ALICE DESARNO;
         COUNTY OF ALLEGHENY; PENN HILLS SCHOOL DISTRICT

                     GARY J. GAERTNER,

                                          Trustee

                       STACY JOHNSON,

                                          Appellant.


                       _____

                       NO. 95-3011
                       _____
```

COUNTY OF ALLEGHENY;
PENN HILLS SCHOOL DISTRICT,

                                    Appellants,


                  v.


        SAMUEL M. DESARNO; ALICE DESARNO

          GARY J. GAERTNER, ESQUIRE,

                                    Trustee.

                  _____

        On appeal from the United States District Court
             for the Western District of Pennsylvania
             (Civil Action Nos. 94-982 and 94-1174)
                  _____


                Argued: November 20, 1995

                BEFORE:  BECKER, SAROKIN
and WELLFORD, Circuit Judges
                  _____


                (Opinion filed July 30, 1996)

Michael G. McCabe, Esq. (ARGUED)
David W. Ross, Esq.
Goehring, Rutter & Boehm
1424 Frick Building
Pittsburgh, PA  15219

        Attorneys for the County of Allegheny
        and the Penn Hills School District,
        Appellants in Nos. 95-3007 and 95-3011


Catherine T. Martin, Esq. (ARGUED)
Daniel L. Haller, Esq.
Maria Pekich, Esq.
Neighborhood Legal Services Association
Firm No. 213
928 Penn Avenue
Pittsburgh, PA  15222

        Attorneys for Stacy Johnson,
        Appellant in No. 95-3037

Daniel J. Gates, Esq.
Edgardo D. Santillan, Esq.
Law Offices of Daniel J. Gates, P.C.
828 Frick Building

Pittsburgh, PA  15219

        Attorneys for the Debtors
        Samuel M. DeSarno and Alice DeSarno


          _____

         OPINION OF THE COURT
          _____

WELLFORD, Circuit Judge:

## I. OVERVIEW

The primary dispute in this appeal concerns the rate of postpetition interest to which plaintiffs, the Penn Hills School District and Allegheny County, Pennsylvania, are entitled in connection with their oversecured prepetition tax claims against the defendants, numerous Chapter Thirteen bankruptcy debtors.  Plaintiffs contend that interest should accrue at the applicable rates set forth in the Pennsylvania Municipal Code, and thus, that the bankruptcy and district courts erred in approving defendants' bankruptcy plans, which proposed to pay postpetition interest at a substantially lesser rate.  Having carefully considered this issue and the others presented in this appeal, we AFFIRM in part and REVERSE in part.

## II. STATEMENT OF THE CASE

Samuel and Alice DeSarno, Laura and David Rankin, Stacy Johnson, and Alice Bonacci defaulted on real estate taxes owed to Allegheny County and the Penn Hills School District.  Because the salient facts are identical as to each defendant, we limit our background discussion to the DeSarnos.  After the Desarnos defaulted on their tax obligations, plaintiffs filed secured claims against their principal residence in the approximate amount of $4,500.  Under Pennsylvania law, these claims constitute first liens on the property and plaintiffs are entitled to receive interest on the underlying debts at certain statutorily prescribed rates.  The DeSarnos' residence is worth many times the amount of the principal debt plus interest; thus, plaintiffs' claims are substantially oversecured.

In June 1993, to avoid a foreclosure on their house, the DeSarnos filed a voluntary petition for bankruptcy under Chapter Thirteen of the United States Bankruptcy Code.  The DeSarnos subsequently filed a plan proposing to pay in full plaintiffs' prepetition claims (100

percent of the principal debt plus interest at the statutory rates), but proposing to pay postpetition interest at a rate much lower than those prescribed by the relevant Pennsylvania statutes.

In November 1993, the bankruptcy court confirmed the DeSarnos' plan subject to a determination of the appropriate postpetition interest rate. The bankruptcy court directed the parties to file briefs supporting their respective positions, but did not schedule oral argument or conduct an evidentiary hearing on the matter. Allegheny County and Penn Hills argued at the confirmation hearing that they were entitled to interest at twelve and ten percent per annum, respectively, pursuant to Pennsylvania statutes. The DeSarnos, on the other hand, argued that plaintiffs' postpetition claims were modifiable under 11 U.S.C. 1322(b)(2) and that postpetition interest should be set to accrue at a "reasonable" rate, as opposed to the statutory rates.

In May 1994, the bankruptcy court confirmed the DeSarnos' plan in its entirety, holding that plaintiffs' claims were modifiable and that the proposed rate of postpetition interest met and exceeded the rate that the court determined to be reasonable. Thereafter, plaintiffs sought review of the plan in the district court. Notwithstanding initial concern over the bankruptcy court's failure to hold an evidentiary hearing to aid in its determination of an appropriate interest rate, the district court affirmed the bankruptcy court's decision. This timely appeal ensued. Defendant Stacy Johnson subsequently filed a cross-appeal challenging the applicable rate of prepetition interest for Allegheny County.

### III. ISSUES ON APPEAL

The following issues are before us in this appeal and cross-appeal: (1) whether it was error to determine that Allegheny County is entitled under Pennsylvania statutory law to prepetition interest at a rate of twelve percent per annum; (2) whether the lower courts erred in holding that a tax claim secured by a statutory lien on a Chapter Thirteen debtor's principal residence is modifiable pursuant to 11 U.S.C. 1322(b)(2); and (3) if so, whether the reduced rate of postpetition interest approved by the lower courts provides plaintiffs with the "present value" of their claims pursuant to 11 U.S.C. 1325(a)(5)(B)(ii).

### IV. STANDARD OF REVIEW

We review the bankruptcy court's findings of fact for clear error. Sharon Steel

Corp. v. National Fuel Gas Distrib. Corp., 872 F.2d 36, 38 (3d Cir. 1989). We exercise plenary review, however, in regard to the bankruptcy court's "choice, application and interpretation of legal precepts." Id. at 38-39.

## V. DISCUSSION
### A. Prepetition Interest

We first address whether the bankruptcy court correctly determined that Allegheny County is entitled to prepetition interest on its tax claims at a rate of twelve percent under Pennsylvania law. Although most of the defendants have conceded this point, defendant Johnson argues that the county is entitled to a maximum interest rate of only ten percent. We disagree.

Pursuant to 72 Pa. Cons. Stat. Ann. 5648, "second class" Pennsylvania counties are entitled to interest on all county tax delinquencies and may adopt a maximum interest rate of twelve percent per annum on these debts. It is undisputed that Allegheny County is the only "second class" county for purposes of 5648 and that its County Commissioners have chosen to charge tax debtors the maximum amount allowed under that statute. Nevertheless, Johnson argues that 5648 conflicts with and is governed by 53 Pa. Cons. Stat. Ann. 7143, which provides that interest claims made by municipalities for unpaid taxes cannot exceed ten percent per annum.

We agree that 7143 conflicts with 5648, but we do not find 7143 to be controlling. Notwithstanding Johnson's assertions to the contrary, 5648 is the more specific of the two statutes because it deals with tax delinquencies in second class counties. Further, the ten percent interest rate of 7143, established by an amendment dated October 29, 1981, predatesthe twelve percent interest rate of 5648, which was established on May 5, 1982. See Pa. Laws 319, No. 113, 1; Pa. Laws 372, No. 106, 1. Section 1933 of the Pennsylvania Statutory Construction Act of 1972 provides:

> Whenever a general provision in a statute shall be in conflict with a special provision in the same or another statute, the two shall be construed, if possible, so that effect may be given to both. If the conflict between the two provisions is irreconcilable, the special provisions shall prevail and shall be construed as an exception to the general provision, unless the general provision shall be enacted later and it shall be the manifest intention of the General Assembly that such general provisions shall prevail.

1 Pa. Cons. Stat. Ann.  1933 (emphasis added).  Based on  1993, the special provision
allowing twelve percent interest to second class counties embodied in  5648 prevails over the
general provision of  7143 and must be construed as an exception to it.

To summarize,  5648 is inconsistent with  7143 because it specifically empowers
the Allegheny County commissioners to establish an interest rate of up to twelve percent on
delinquent taxes.  Section 7143, on the other hand, provides for a maximum rate of only ten
percent.  Thus, the two statutes are in conflict because they authorize different rates.  The
commissioners, taking advantage of the full authorization of  5648, established the applicable rate
at twelve percent.  We believe that  5648--the later, more specific statute--controls here.
Accordingly, we hold that Allegheny County is entitled to prepetition interest at a rate of twelve
percent per annum under  5648 and thus AFFIRM the ruling of the lower courts on that issue.

### B. Postpetition Interest

Turning to the next issue, we note that the parties agree that plaintiffs are entitled
to some amount of postpetition interest on their claims, but they disagree as to the rate at which
such interest should accrue.  In this regard, plaintiffs first argue that the lower courts erred in
holding that their claims to postpetition interest at the statutory rates are modifiable under 11
U.S.C.  1322(b)(2).  Alternatively, plaintiffs assert that the confirmed interest rates are
insufficient to provide them with the present value of their allowed secured claims under 11
U.S.C.  1325(a)(5)(B)(ii).  We address each of these contentions in turn.

#### (1) 11 U.S.C.  1322(b)(2)

Section 1322(b)(2) of the Bankruptcy Code provides that Chapter Thirteen plans
may "modify the rights of holders of secured claims, other than a claim secured only by a security
interest in real property that is the debtor's principal residence."  11 U.S.C.  1322(b)(2)
(emphasis added).  Defendants concede that plaintiffs' claims are secured by liens on their
principal residences.  Therefore, the key issue is whether those liens constitute "security interests"
for purposes of the antimodification provision of  1322(b)(2).

The Bankruptcy Code defines "security interest" as "a lien created by an
agreement." 11 U.S.C.  101(51) (emphasis added).  In contrast, the Code provides that the term

"statutory lien" means a "lien arising solely by force of a statute on specified circumstances or
conditions . . . but does not include security interest or judicial lien." 11 U.S.C.  101(53)
(emphases added).  Because plaintiffs' tax liens arose under state statute, and not from a
consensual or voluntary agreement with the taxpayer defendants, we concur in the bankruptcy
court's ruling that those liens are not "security interests" for purposes of  1322(b)(2).

The foregoing interpretation of  1322(b)(2) is supported by substantial authority
from other jurisdictions.  See, e.g., In re DeMaggio, 175 B.R. 144, 146-47 (Bankr. D.N.H.
1994) (holding that plain language and statutory history of  1322(b)(2) establish that
nonconsensual tax liens do not fall within antimodification provision of that statute); In re Sabec,
137 B.R. 659, 667-68 (Bankr. W.D. Mich. 1992) (finding antimodification provision of
1322(b)(2) inapplicable because creditor's interest in the principal residence of the debtor was a
"lien," rather than a "security interest," based on the fact that it arose nonconsensually under state
tax act); In re Venable, 48 B.R. 853, 856 (Bankr. S.D.N.Y. 1985) (holding that city's tax lien
on debtor's principal residence was modifiable despite  1322(b)(2) because not consensual, and
thus, not a "security interest"); In re Mitchell, 39 B.R. 696, 700 (Bankr. D. Or. 1984) (finding
IRS lien on debtor's principal residence modifiable because statutory, not created by agreement
as required by  1322(b)(2)); In re Seel, 22 B.R. 692, 695-96 (Bankr. D. Kan. 1982) (holding
modifiable a mechanic's lien on debtor's principle residence because it was a "statutory lien").
Nevertheless, plaintiffs urge us to hold that statutory tax liens on principal residences are not
modifiable under  1322(b)(2) because Congress has historically made explicit reference to tax
liens in provisions of the Bankruptcy Code intended to affect such liens.  Plaintiffs further assert
that the existence of public policy concerns analogous to those invoked by Congress in exempting
liens for unpaid postpetition property taxes from the automatic stay indicates that Congress did
not mean for tax liens to be modifiable under  1322(b)(2).  In light of the plain language of
1322(b)(2), however, we must decline plaintiffs' invitation to speculate as to the intent of
Congress in this context.  "Where the statutory language is clear, our "'sole function . . . is to
enforce it according to its terms.'"  Rake v. Wade, 508 U.S. 464, 471 (1993) (quoting United

States v. Ron Pair Enters., Inc., 489 U.S. 235, 241 (1989)).

### (2) 11 U.S.C. 1325(a)(5)(B)(ii)

Our conclusion that plaintiffs' claims are modifiable under 1322(b)(2) does not dispose of this appeal. We must also determine whether the postpetition interest rate confirmed by the lower courts passes muster under 11 U.S.C. 1325(a)(5)(B)(ii). In a Chapter 13 bankruptcy, the debtor is given the opportunity to retain property which would otherwise be subject to foreclosure by secured creditors. "In exchange for giving the debtor a right to continue possession of the property, 1325(a)(5)(B) directs two things: (i) the secured creditor shall retain a continuing lien on the property; and (ii) the secured creditor shall receive from the debtor 'the value, as of the effective date of the plan, of such property to be distributed under the plan on account of such claim [which shall be] not less than the allowed amount of such claim.'" GMAC v. Jones, 999 F.2d 63, 66 (3d Cir. 1993) (quoting 11 U.S.C. 1325(a)(5)(B)(ii)). The latter provision requires that the payments to the secured creditor have a "present value" equal to the creditor's allowed secured claim. 5 Collier on Bankruptcy 1325.06[4][b][iii][B] (15th ed. 1982). Present value is a market rate concept, determined by the use of an interest rate which fairly compensates the creditor for not receiving the full amount of its secured claim upon confirmation of the debtor's plan. There is wide disagreement, however, as to what constitutes an appropriate rate of interest in this context. See In re Mitchell, 39 B.R. at 700. Although this court has posited a framework for determining an appropriate interest rate under 1325(a)(5)(B)(ii) in the context of commercial creditors, neither this court nor the Supreme Court has addressed that issue in the context of nonconsensual tax lien creditors such as plaintiffs.

In the case at bar, the bankruptcy court began its 1325(a) analysis with the statutory interest rates, but dismissed them as being in the nature of a penalty. According to the court, the statutory rates were raised by the Pennsylvania Legislature from six percent to their present levels in response to the extremely high commercial interest rates of the late 1970's and early 1980's. In the court's view, the state's purpose in raising the statutory rates was to "coerce and encourage prompt payment of taxes in competition with other higher commercial rates."

Having rejected the statutory rates, the bankruptcy court attempted to determine a more reasonable interest rate, ultimately concluding that the appropriate rate under 1325(a)(5)(B)(ii) was "the reasonable cost of interest to the [plaintiffs], as of the effective date of the plan, over a 60 month period." Consulting published historical interest rates for municipal bonds, the court determined that, at a minimum, postpetition interest should accrue at 4.05 percent for Allegheny County and 4.30 percent for Penn Hills. Since defendants' plans proposed to pay postpetition interest at seven percent per annum, they were confirmed.

Plaintiffs contend that the bankruptcy court's rejection of the statutory rates was erroneous. In support of their position, plaintiffs rely principally upon our previously cited decision in Jones, wherein we addressed the issue of interest rates under 1325(a) in the context of a commercial creditor. In Jones, General Motors Acceptance Corporation ("GMAC") filed secured claims against a number of Chapter 13 debtors who, prior to taking bankruptcy, had purchased GMC trucks and defaulted on their financing obligations. Jones, 999 F.2d at 65. GMAC subsequently objected to the debtors' bankruptcy plans on grounds that the proposed interest rates were too low to provide it with the present value of its claims under 1325(a)(5)(B)(ii). Id. at 66.

Reversing the bankruptcy and district courts, this court held that the interest rate should be determined with reference to the purpose behind 1325(a)(5)(B)(ii): "to put the secured creditor in an economic position equivalent to the one it would have occupied had it received the allowed secured amount immediately, thus terminating the relationship between the creditor and the debtor." Id. at 66-67. The Jones court then rejected the bankruptcy court's "cost of funds" approach, which looks to the rate at which the creditor can borrow funds, as falling short of this statutory objective by failing to account for: (1) the cost to the creditor of sustaining its lending relationship with the debtor past the point contemplated in the original agreement; and (2) the expectation of commercial creditors to make a profit when extending credit. Id. at 67, 69.

Ultimately, the Jones court concluded that a "coerced loan" theory should provide the starting point for determining interest rates under 1325(a)(5)(B)(ii). Id. at 67. Thus, the

court held that the appropriate rate of interest is "that which the secured creditor would charge, at the effective date of the plan, for a loan similar in character, amount and duration to the credit which the creditor will be required to extend under the plan."  Id. at 65 (footnote added). According to the court, this approach, unlike the cost of funds method, closely approximates the creditor's immediate liquidation position because it recognizes that creditors incur costs associated with the coerced extension of credit and because it incorporates a consideration of profit into the determination of the  1325(a) interest rate.  Id. at 67–69.  The court further found the coerced loan approach appealing because it would reduce the litigation and transaction costs of Chapter 13 cases due to the fact that "regularly maintained documents of the creditor should make it possible for the debtor and creditor to stipulate on the interest rate the creditor would charge for a new loan of similar character, amount and duration."  Id. at 70.

Plaintiffs in the case at bar make two arguments based on Jones.  First, they contend that the plain language of that decision requires that interest in the present case be set to accrue at the rates that they charge nonbankrupt, delinquent taxpayers (i.e., the statutory rates).  Second, plaintiffs assert that the bankruptcy court erred in applying a cost of funds approach because that approach was specifically rejected in Jones.  We agree with plaintiffs that the bankruptcy court's analysis was flawed.

In our view, the district court plainly erred by looking solely to plaintiffs' cost of funds in assessing the appropriateness of the proposed postpetition interest rates in this case.  As the Ninth Circuit has noted, such an approach forces a governmental creditor to

> incur an unconditional obligation to repay the money
> it was required to borrow . . . in exchange [for] only
> an inherently risky promise by the debtor to repay
> the same amount over the applicable time period at
> essentially the same rate paid by the government on
> its obligation.

In re Camino Real Landscape Maint. Contractors, Inc., 818 F.2d 1503, 1506 (9th Cir. 1987) (citation omitted).  Thus, the governmental creditor is "worse off as a result of the exchange." Id.  Moreover, "there is no indication that Congress meant to subsidize debtors by making available to them the government's own favorable rate of interest."  Id.  Thus, we hold that for

plaintiffs to be properly compensated, consistent with Jones, postpetition interest rates must be set in accordance with the municipalities' costs of maintaining their creditor relationship.

Since municipalities are not for-profit lending institutions and do not regularly extend loans that can be used to determine the appropriate rate of interest, the case at bar is not on all-fours with Jones. Nevertheless, we do not believe that Jones is totally inapplicable in this situation, despite GMAC's status as a for-profit entity, or that the "cost of funds" approach would be proper if applied to the debtor instead of the creditor. Therefore, the principles of Jones must be given effect, even if it is not factually identical.

We believe that the closest analog to the market loan in Jones is the statutory interest rate here. While the analogy is not perfect, it is sufficient: an entity forced to delay payment that it is entitled to receive is, in effect, extending a loan. And the rate that the municipality charges for those that coerce loans by not paying their property tax bills is twelve percent. In fact, as the difficulties in arriving at another rate have shown, the statutory rate is really the only practical and reasonable rate to apply. The statutory rate also serves the administrative efficiency goal of establishing a readily ascertainable "market" rate that will not require the time and expense of case-by-case litigation and potentially inconsistent results.

Political and financial market forces will generally operate to keep the statutory rate reasonable. The rate is set by elected officials accountable to citizens who, after all, must balance their desire to make their neighbors pay their property taxes with the consideration that they themselves may be in default some day. In addition, the financial market might provide the best check against oppressive rates. If a debtor can, in fact, do better than the statutory rate, he or she will rationally do what consumers normally do when rates (for instance, mortgage notes) become higher than the market. The debtor will "refinance" by obtaining the new loan at the lower available rate, using the funds to pay off the old loan. Indeed, the statutory rate at issue in this case--twelve percent--is not unreasonable. Credit card companies regularly charge their customers, who are not even high credit risks, interest at rates as high as eighteen percent. The debtors in this case, of course, are in bankruptcy and, although the municipality currently holds liens that are oversecured, property values can decline.

In support of our holding, we note that numerous courts have held that nonconsensual oversecured creditors are entitled to receive the rates of interest dictated by the statutes under which their liens arose, unless those rates constitute a penalty. See, e.g., Galveston Ind. Sch. Dist. v. Heartland Fed. Sav. & Loan Ass'n, 159 B.R. 198, 204 (Bankr. S.D. Tex. 1993); see also In re Parr Meadows Racing Ass'n, 880 F.2d 1540, 1549 (2d Cir. 1989), cert. denied sub nom., Suffolk County Treasurer v. Barr, 493 U.S. 1058 (1990). Although the bankruptcy court initially determined that the statutory rates at issue in this appeal are in the nature of a penalty, we find this decision to be in error. See Meilink v. Unemployment Reserves Commission, 314 U.S. 564 (1942). In Meilink, a unanimous Supreme Court held that a statutorily imposed interest rate of twelve percent on debts owed to a state's unemployment fund did not constitute a penalty within the meaning of the Bankruptcy Code. In that regard, the Court stated:

> It is common knowledge that interest rates vary not only according to the general use value of money but also according to the hazard of particular classes of loans. Delinquent taxpayers as a class are a poor credit risk; tax default, unless an incident of legitimate tax litigation, is, to the eye sensitive to credit indications, a signal of distress. A rate of interest on tax delinquencies which is low in comparison to the taxpayer's borrowing rate--if he can borrow at all--is a temptation to use the state as a convenient, if involuntary, banker by the simple practice of deferring the payment of taxes.
>
> Another variable is the amount necessary to compensate for the trouble of handling the item. The legislature may include compensation to the state for the increased costs of administration in the exaction for delay in paying taxes without thereby changing it from interest to penalty.

Id. at 567.

We believe that Judge Sarokin's arguments for using the prime rate prove too much. If the prime rate represents the appropriate rate in the commercial marketplace, why did not the Jones court use the prime rate in that case, which, after all, involved a commercial lender?

Moreover, that the Pennsylvania legislature has not seen fit to change the statutory rate on delinquent tax loans for some years, in our view, does not render the twelve percent rate

penal or unreasonable.  If the statutory rate, as suggested by the dissent, "far exceed[s] what the
Plaintiffs could obtain under current market conditions," then the debtors (or the bankruptcy
trustee) can proceed to obtain the more favorable rate in the market.

## VI. CONCLUSION

Based on the foregoing, we AFFIRM the district court's award of prepetition
interest to Penn Hills and Allegheny County at the statutory rates of ten and twelve percent per
annum, respectively.  We REVERSE, however, the decisions of the bankruptcy court and district
court on the issue of postpetition interest rates and hold that Penn Hills and Allegheny County are
also entitled to postpetition interest at the respective statutory rates. Rankin v. DeSarno, Nos. 95–3007/3011/3037

_____

SAROKIN, Circuit Judge, concurring in part and dissenting in part:

I join Parts I, II, III, IV, V.A, and V.B.(1) of the Majority's opinion.  However,
because I do not believe that the statutory rate should apply to postpetition interest, I dissent from
the Majority's analysis and conclusion in Part V.B.(2).

I agree with the Majority that the "cost of funds" approach adopted by the
bankruptcy court is flawed because it under-compensates the municipality and it offers the debtors
a windfall by enabling them, in effect, to borrow funds from the municipality at rates that are
generally available only to state entities.

But because I do not agree with the Majority's reliance on General Motors
Acceptance Corp. v. Jones, 999 F.2d 63, 67 (3d Cir. 1993), I would reject as well the Plaintiffs'
suggestion that we apply the statutory rate to post-petition interest payments.

The situation here differs from that in Jones in one important way: in Jones, the
creditor was a commercial lender, in the business of lending money to earn a profit.  Unlike the
Majority, see Majority Op., typescript at 12, I believe that this difference is significant.

### I. The statutory rate

In a market that is subject to the rigors and constraints of competition, the interest
rate charged by a commercial lender (Lender A)  should reflect the approximate cost of capital
plus transaction costs, and a small profit component.  If interest is set at a rate that substantially
exceeds Lender A's costs in order to yield greater profits, competitors should be able to lure
borrowers away from Lender A by setting their rates below that charged by Lender A while still

earning a profit.  Ultimately, the more competitive the market, the more closely the rate will reflect the costs incurred by the lender.  Therefore, setting post-petition interest at a rate equal to the rate charged by a creditor-lender in the commercial market should come closest to compensating that creditor both for the non-availability of its capital and for the costs of maintaining the relationship, and should therefore "put the secured creditor in an economic position equivalent to the one it would have occupied had it received the allowed secured amount immediately, thus terminating the relationship between the creditor and the donor."  Jones, 999 F.2d at 66-67.

Here, the creditors are governmental entities.  The interest rates that they can charge "debtors" -- i.e., those who have defaulted on their tax payments -- are not constrained by competitive considerations, but imposed by statute.  These rates were set at their current level in the early 1980s, and have not been modified since.  "Courts are generally in agreement that an interest rate to compute present value must be responsive to current economic conditions" and "that an unchanging fixed rate established at some prior time is not appropriate in a present value analysis."  In re DeMaggio, 175 B.R. 144, 150-51 (Bankr. N.H. 1994).  It is easy to understand why: market rates have dropped significantly since the early 1980s.  The statutory rates have not followed the commercial market's downward path and as a result "ha[ve] no relation to current economic conditions."  Id. at 151.  In fact, they far exceed what the Plaintiffs could obtain under current market conditions.  Because they are so high, the statutory rates now "include a punitive element that is contrary to the purposes of the Bankruptcy Code" and "inimical to financial rehabilitation of the debtor."  In re Camino Real Landscape Maintenance Contractors, Inc., 818 F.2d 1503, 1507 n.2 (9th Cir. 1987).  See also In re DeMaggio, 175 B.R. at 151 (noting that "[i]nterest rates on delinquent taxes frequently incorporate a punitive aspect to discourage nonpayment.").

Because statutory rates are not subject to the discipline of the market, and because considerations of deterrence may in fact warrant a rate of interest for tax evasion that far exceeds costs, there is no reason to expect that the statutory rates are calculated to compensate the Plaintiffs for the present value of their claims, and to serve the objective of section

1325(a)(5)(B)(ii), which is "to put the creditor in the same position it would have been in if it had been allowed to end the lending relationship at the point of the bankruptcy filing by repossessing the collateral." Jones, 999 F.2d at 69. Therefore, I reject the approach recommended by the Plaintiffs and espoused by the Majority, and would not set the postpetition interest rate at the statutory rate.

## II. The prime rate

I would hold, instead, that the appropriate rate to compute the present value of a claim by an oversecured government creditor pursuant to section 1325(a)(5)(B)(ii) is the rate charged by commercial banks to prime commercial loan customers -- that is, the prime rate -- for a loan of equivalent amount and duration. This method has been adopted by other courts, see, e.g., In re Jordan, 130 B.R. 185, 191 (D.N.J. 1991); In re Hudock, 124 B.R. 532, 534 (N.D. Ill. 1991), and it addresses most of the concerns raised by alternative methods.

First, because it imposes a rate higher than the municipal bond rate, it offers the Plaintiffs a measure of compensation for the various costs, beyond the costs of capital, incurred in the delayed collection of tax payments.

Second, because it is based on a market rate, it is sensitive to changes in the costs of borrowing in the larger economy, and derivatively to the costs of borrowing for municipal governments as well. "Market rates are the best indicators of the present value of deferred payments because they are products of supply and demand, reflecting the interactions of economic variables that affect the cost of lending money." In re Ivey, 131 B.R. 43, 49 (Bankr. N.C. 1991).

Third, because it is divorced from the statutory rate, it does not include a punitive element that is inimical to the purposes of bankruptcy reorganization.

Fourth, it is a readily available figure, and therefore relatively easy to compute.

Fifth, it does not create any incentives for debtors to delay payment of their real property taxes, since they would incur little benefit from such a delay.

I note that the Plaintiffs had urged that we consider a variation of this approach if we rejected the statutory rate. Specifically, they had urged that we adopt the prevailing commercial market rate, but taking into account factors such as the term of the payout period, the value of security and the risk of default, the statutory rate of interest, and the characteristics of

the debtor in each case. Clm. Brf. at 34. Several circuits have adopted this measure of present value for debt owed to government, albeit in the context of a Chapter 11 bankruptcy. See, e.g., In re Camino Real Landscape Maintenance Contractors, Inc., 818 F.2d at 1504 (holding that "the debtor must pay the government interest at the rate the debtor would pay a commercial lender for a loan of equivalent amount and duration, considering the risk of default and any security); United States v. Neal Pharmacal Co., 789 F.2d 1283, 1289 (8th Cir. 1986); In re Southern States Motor Inns, Inc., 709 F.2d 647, 652-53 (11th Cir. 1983) (same). Under this more refined approach, "the bankruptcy court must make a case-by-case determination of what interest the reorganizing debtor would have to pay a creditor in order to obtain a loan on equivalent terms in the open market." In re Camino Real Landscape Maintenance Contractors, Inc., 818 F.2d at 1508.

The approach urged upon us by the Plaintiffs is unnecessarily unwieldy, and therefore I would reject it. All three cases cited by the Plaintiffs dealt with the proper method for determining the rate of interest to be applied in calculating deferred payments of delinquent federal taxes pursuant to 11 U.S.C. 1129(a)(9)(C). However, section 1129(a)(9)(C) applies only to unsecured claims. Therefore, the risk of default on such debt is substantial. The risk present in the instant case is much less significant. As the DeSarnos note, the County and School District "are at very low risk of not receiving payment while enjoying a correspondingly high quality of security in the event of default under the Plan. The taxing bodies both enjoy priority status as creditors of the Debtors and are first in line to receive the amounts owed due to their position of possessing a statutory lien upon the Debtors' residence." DeSarno Brief at 24. Therefore, it is not necessary to refine our approach to account for the particular characteristics of each debtor.

I recognize that the prime rate approach, which reflects transactions between commercial lenders and borrowers, is not a perfect fit for government creditors. As noted supra, the costs of borrowing for a municipal government and for a commercial lender are not identical, both with regard to their "replacement costs" -- i.e., the rate at which they can borrow funds -- and "transaction costs." In addition, the market rate reflects the profit margin that motivates commercial lenders in the first place, but that is not a consideration for municipalities.

While the commercial market rate of interest for a low-risk, secured loan is not a perfectly accurate measure, exactitude is not the only consideration -- judicial economy and efficiency are also important factors, especially in matters involving high volume and relatively low amounts.  Numerous courts, including this one, have recognized "the importance of minimizing the expense of getting a chapter 13 plan formulated and approved," Jones, 999 F.2d at 70, and therefore devising a formula that is relatively easy to compute.  I believe that the approach I suggest here strikes the best balance between these two priorities and satisfactorily addresses our various other concerns as well.