**PENTLONG CORPORATION, a Pennsylvania Corporation and Weitzel, Inc., a Pennsylvania Corporation, individually and on behalf of themselves and all others similarly situated, Appellants,**

v.

**GLS CAPITAL, INC. and County of Allegheny.**

Commonwealth Court of Pennsylvania.

Argued May 9, 2001.

Decided July 5, 2001.

Reargument Denied Sept. 10, 2001.

Bernard S. Rubb, Sewickley, for appellants.

Michael G. McCabe, Stacey F. Vernallis and Byron D. Xides, Pittsburgh, for appellees.

Before DOYLE, President Judge, COLINS, Judge, SMITH, Judge, PELLEGRINI, Judge, FRIEDMAN, Judge, KELLEY, Judge, and LEADBETTER, Judge.

PELLEGRINI, Judge.

Pentlong Corporation (Pentlong) and Weitzel, Inc. (Weitzel), both Pennsylvania corporations, individually and on behalf of themselves and all others similarly situated (collectively, Delinquent Taxpayers) appeal from an order of the Court of Common Pleas of Allegheny County (trial court) dismissing with prejudice their class action complaint against GLS Capital, Inc., a Virginia corporation (GLS).

This case emanates from a Purchase and Servicing Agreement that was entered into between the County of Allegheny (the County) [1] and GLS on September 29, 1997, in which the County assigned all of its rights, title and interest to over 125,000 property tax liens it had filed through the 1995 tax year to GLS in consideration of approximately $35 million.[2] The County later assigned the 1996 matching liens for the same properties for an additional amount in excess of $2.5 million.[3] In collecting on the delinquent taxes, GLS required that the taxpayer pay, by certified or cashier's check, the full face amount of the tax, penalties and interest, attorney's fees, lien filing fees, lien satisfaction fees, lien assignment fees and lien revival fees. The accrued interest as determined by GLS included interest for the entire month in which payment in full was made regardless of the day within the month that the taxes were paid in full.

Pentlong, which is the record owner of certain real property situated in the County, failed to pay full property taxes for three calendar years. To secure the amount owed, the County filed liens against the property which were later assigned to GLS under GLS's agreement with the County. On March 16, 1998, Pentlong received a GLS Capital Tax Lien Payoff Report from GLS indicating the face amount of its liens as $1,252.89, that interest had accrued on the unpaid taxes in the amount of $281.99, penalties totaled $32.76, and additional costs totaled $180, or $60 for each of the three years that taxes were owed. Pentlong was instructed that payment had to be made by certified funds to GLS's Pittsburgh office before the end of March 1998 or any amount not received by that time would accrue an additional $12.53 per month representing

---

1. The County is a Pennsylvania County of the Second Class and is entitled to assess and collect property taxes on real property situated within the County. The taxes are secured by liens against the properties for which property taxes are delinquent.

2. Specifically, Article II, Section 2.1 of the Purchase and Servicing Agreement provided:

   **Section 2.1. Agreement to Purchase Tax Liens.** Subject to the terms and conditions of this Agreement, the Seller hereby agrees to transfer, and the Purchaser hereby agrees to purchase, without recourse, representation or warranty, except as provided herein, all right, title and interest of the Seller in and to the Tax Lien Portfolio including all rights provided by applicable Laws for collection and enforcement of such Tax Liens....
   In consideration for the transfer of the Tax Lien Portfolio by the Seller to the Purchaser, the Purchaser agrees to pay the Seller on the Closing Date an amount equal to 96.0058% of the aggregate Face Value of the Tax Liens listed on the Tax Lien Schedule (the "Purchase Price").

3. However, in this subsequent Agreement, GLS agreed to pay the County 100% of the aggregate tax lien amount plus six months of accrued interest at 1% per month. In Exhibit A, though,—the Certification of Value of Tax Lien Portfolio—it is indicated that GLS paid the County 100% of the aggregate amount of the tax liens plus 5% percent penalty and 6% interest on the aggregate tax lien amount.

1% of the total face amount of the liens. On March 18, 1998, Pentlong paid the full amount under protest, including interest at the rate of 12% per annum computed through the end of March 1998.

Weitzel also is the record owner of real property in the County and failed to pay its property taxes from 1988 to 1995. Its taxes were also secured by liens which were later assigned to GLS. On May 21, 1998, GLS sent Weitzel a GLS Capital Tax Lien Payoff Report indicating the face amount of its liens, interest, penalties and costs and requested payment by cashier's check or certified check of the total due or it would proceed with a Sheriff's sale of the property. The notice indicated that "costs" included $55 for tax years 1988, 1989, 1990, 1991 and 1993, and $60 for tax years 1994 and 1995, for a total of $395.[4] There was also an item labeled "fees and expenses" in the amount of $2,829.59 and an item labeled "execution costs" in the amount of $1,229.50. These fees and expenses and execution costs included attorneys' fees and expenses. Although the Report did not state the interest rate being charged by GLS, it reflected that total interest accrued on the Weitzel taxes was computed at the rate of 12% per annum. Before the Sheriff's sale took place, Weitzel paid under protest the amount owed.

Subsequently, Delinquent Taxpayers filed a two-count class action complaint against GLS on behalf of all owners of real estate in the County whose real property had been encumbered by liens for delinquent County property taxes for tax years before and including 1996 and who had been assessed or billed for certain improper charges by GLS or had paid such improper charges to GLS in connection with those delinquent taxes. In Count I of its complaint, Delinquent Taxpayers alleged that GLS was unjustly enriched because:

- GLS was not entitled to collect 12% interest on the unpaid face amount of its assigned liens as that is the amount of interest that only the County can charge under Section 1 of the Local Taxation Law, Act of May 31, 1933, P.L. 1135, *as amended,* 72 P.S. § 5648 and once GLS purchased the lien, that right ceased.

- GLS was not entitled to collect a full month's interest for only a partial month of delinquency;

- GLS was not entitled to collect attorney's fees from taxpayers;

- GLS was not entitled to collect costs from taxpayers, including lien filing fees, satisfaction fees, transfer/assignment fees, and lien revival fees not recorded as of record; and

- GLS was liable to taxpayers for costs they incurred resulting from GLS's requirement that taxpayers pay for their liens by certified funds.

Regarding those contentions, Delinquent Taxpayers claimed that 1) GLS did not succeed to certain governmental privileges when it bought the liens; 2) but if GLS did, the County did not take necessary action to implement those actions; and 3) certain assessed amounts imposed were not authorized and procedures implemented were improper. In Count II, Delinquent Taxpayers alleged that GLS was guilty of a fraudulent scheme to assess, bill and collect unauthorized amounts. They sought declaratory and injunctive relief as well as damages.

GLS filed preliminary objections alleging that Delinquent Taxpayers' complaint failed to state a cause of action for unjust enrichment because the additional charges added to the tax lien were charges that the County and its Prothonotary could impose

---

4. For some reason not explained in the rec- ord, tax year 1992 was excluded.

and to which they were entitled upon the purchase of the taxes, interest and costs in each case. GLS further asked the trial court to strike claims related to GLS's request for payment by certified check or certified funds. The trial court denied the preliminary objections but granted GLS's motion to strike the claim for relief arising from GLS's instruction that lien payments be made by certified check with leave to Delinquent Taxpayers to amend the complaint. Delinquent Taxpayers filed an amended complaint adding Weitzel, Inc. as a representative plaintiff that had paid GLS by certified check and added additional claims arising from GLS's assessment of improper and inflated attorney's fees. At this point in the proceedings, the County filed a petition to intervene which was granted. It argued that this action was nothing more than a continuation of the challenge of its authority to assign and transfer claims to a third party, although that issue was previously decided in the companion case of *Maierhoffer v. GLS Capital, Inc.*, 730 A.2d 547 (Pa.Cmwlth. 1999), *petition for allowance of appeal denied*, 561 Pa. 680, 749 A.2d 473 (2000), and it believed it was best situated to assert its rights as a tax lienholder and defend long-standing tax collection and enforcement practices.[5] After GLS filed an answer to the amended complaint and the pleadings were closed, GLS filed a motion for judgment on the pleadings.

The trial court dismissed the complaint with prejudice finding that Delinquent Taxpayers and individual property owners could not proceed as a class action because they had failed to exhaust statutory remedies. Specifically, the trial court referred

to Section 14 of the Municipal Claims and Tax Liens Act (Municipal Claims Act), Act of May 16, 1923, P.L. 207, 53 P.S. § 7182 (petitioning the court to determine the amount due) and Section 16 of the Municipal Claims Act, 53 P.S. § 7184 (requesting the claimant to issue a scire facias) as the remedies available to anyone who wanted to challenge the validity of any tax claim and/or any fees and costs assessed as part of that tax lien. Although finding that there was an adequate remedy at law, the trial court, nevertheless, went on to address the merits of the claim finding that 1) the Municipal Claims Act permitted the assignment of all rights of the original holder; 2) tax liens included penalties, interest, costs, revival fees and reasonable attorney's fees; and 3) payment by certified or cashier's checks were part of each tax lien but GLS did not limit the method by which payment was to be remitted. This appeal by Delinquent Taxpayers followed.

## I.

This appeal is the sequel to our decision in *Maierhoffer*. In that case, Maierhoffer, a property owner whose property had been liened by the County, challenged the County's sale of real property tax liens contending the County had no authority to sell or assign tax liens to a private third party such as GLS. Contrary to the contention of GLS and the County that the Municipal Claims Act allowed such sale of tax liens, Maierhoffer argued that the statute only gave local governments the authority to sell municipal claims,[6] not tax

---

5. We note that GLS is not seeking a remedy against the County.

6. "Municipal claim" is defined in Section 1 of the Municipal Claims Act as:
    (1) the claim arising out of, or resulting from, a tax assessed, service supplied, work

done, or improvement authorized and undertaken, by a municipality, although the amount thereof be not at the time definitely ascertained by the authority authorized to determine the same, and a lien therefor be not filed, but becomes filable within the

claims. In rejecting Maierhoffer's position and affirming the trial court, we held that because Section 1 of the Municipal Claims Act defined "tax claim" as "the claim filed to recover taxes" and Section 33 of the Municipal Claims Act, 53 P.S. § 7147, provided that any claim filed under the Municipal Claims Act could be assigned or transferred to a third party and that the assignee or transferee succeeded to the rights of the original holder, in this case, the County, a sale of tax liens was authorized. We did not specifically address, however, what rights GLS acquired. We did recognize, though, that "[c]ertain sections of the [Municipal Claims] Act relate exclusively to tax claims or to municipal claims, but not to both." *Maierhoffer*, 730 A.2d at 551.

In addressing the issue of what charges GLS is entitled to collect, we must initially determine what exactly GLS "bought" when it purchased the County liens. As previously mentioned, those liens were bought pursuant to Section 33 of the Municipal Claims Act, 53 P.S. § 7147, which provides in relevant part:

> Any claim filed or to be filed, under the provisions of this act, and any judgment recovered thereon, may be assigned or transferred to a third party, either absolutely or as collateral security, and **such assignee shall have all the rights of the original holder** thereof. (Emphasis added.)

GLS claims that when it bought the liens, it not only bought the face amount of the liens and interest on those liens, but it also bought the County's right to utilize the procedures set forth in the Municipal Claims Act to collect those liens. GLS also claims with regard to interest that it is entitled to collect the amount that the County is entitled to collect on delinquent taxes, not liens. Delinquent Taxpayers argue, however, that once GLS bought the liens, not only were the liens "privatized" but so, too, were the procedures used to collect the liens as well as the amount that could be collected, and GLS was only entitled to the rights that a private party would have to collect the liens that it purchased or there would be an improper delegation of governmental power.

Complicating this analysis as to what rights GLS acquired is the fact that neither party offered any evidence describing the procedures the County formerly utilized to collect taxes or any evidence describing the interest, costs and fees the County formerly collected. While we recognize that, in the past, the County may not have been charging all that it was legally entitled to charge under the law, neither party has set forth with any consistency the law on the rights and interests of the County prior to the Agreement with GLS, thereby making the determination of what rights GLS acquired even more difficult.

## II.

### STATUTORY REMEDIES

The threshold question involved in all of Delinquent Taxpayers' claims is whether

period and in the manner herein provided, (2) the claim filed to recover for the grading, guttering, macadamizing, or otherwise improving, the cartways of any public highway; for grading, curbing, recurbing, paving, repaving, constructing, or repairing the footways thereof; for laying water pipes, gas pipes, culverts, sewers, branch sewers, or sewer connections therein; for assess-ments for benefits in the opening, widening or vacation thereof ... and (3) the claim filed to recover for work, material, and services rendered or furnished in the construction, improvement, maintenance, and operation of a project or projects of a body politic or corporate created as a Municipal Authority pursuant to law.
53 P.S. § 7101.

this action can be maintained in equity or whether there are prescribed statutory remedies that must be followed that preclude Delinquent Taxpayers from challenging the interest, fees and costs that GLS imposed. Our Supreme Court in *School District of Borough of West Homestead v. Allegheny County Board of School Directors*, 440 Pa. 113, 118, 269 A.2d 904, 907 (1970), explained the following with regard to the pursuit of statutory remedies:

> [I]f the legislature provides a specific, *exclusive*, constitutionally adequate method for the disposition of a particular kind of dispute, no action may be brought in any 'side' of the Common Pleas to adjudicate the dispute by any kind of 'common law' form of action other than the exclusive statutory method. (Emphasis in original.)

The trial court found there were statutory remedies that were specific and exclusive and available to Delinquent Taxpayers to challenge the charges being challenged here.[7] One prescribed statutory remedy that the trial court found was a procedure contained in the Municipal Claims Act. Under that Act, for a taxpayer to challenge any costs assessed by a lienholder in conjunction with the lien against its property, the taxpayer must request the lienholder to issue a scire facias. Section 16 of the Municipal Claims Act, 53 P.S. § 7184, provides:

> Any party named as defendant in the claim filed, or admitted to defend there against, may file, as of course, and serve a notice upon the claimant or upon the counsel of record to issue a scire facias thereon, within fifteen days after notice so to do. If no scire facias be issued within fifteen days after the affidavit of service of notice is filed of record, the claim shall be stricken off by the court, upon motion. If a scire facias be issued in accordance with such notice, the claimant shall not be permitted to discontinue the same, or suffer a nonsuit upon the trial thereof, but a compulsory nonsuit shall be entered by the court if the claimant does not appear, or withdraws, or for reasons fails to maintain his claim.

■■■ A scire facias proceeding is the procedure by which a lienholder prosecutes a lien to judgment and has been defined as:

> a mandate to the sheriff, which recites the occasion upon which it issues, which directs the sheriff to make known to the parties named in the writ that they must appear before the court on a given day, and which requires the defendant to appear and show cause why the plaintiff should not be permitted to take some step, usually to have advantage of a public record. The object of the writ of scire facias is ordinarily to ascertain the sum due on a lien of record and to give the defendant an opportunity to show cause why the plaintiff should not have execution. The writ of scire facias serves the dual purposes of a summons

---

7. Delinquent Taxpayers also argue that the trial court erred in dismissing its complaint on the basis that a class action was not viable because its class action is proper as it is against a private, for-profit entity that overcharged thousands of taxpayers in the collection of assigned tax liens. While a class action may not be available against a governmental entity, it does not mean that the action is dismissed, only that it is dismissed as a class action. *Klemow v. Time, Inc.*, 466 Pa. 189, 352 A.2d 12 (1976), *cert. denied*, 429 U.S. 828, 97 S.Ct. 86, 50 L.Ed.2d 91 (1976) (even if appellant cannot establish his action is proper as a class action, his individual action may still go forward). Because the class has never been certified, we make no decision as to the propriety of the class action allegations.

and a complaint... [8]

*Shapiro v. Center Township, Butler County,* 159 Pa.Cmwlth. 82, 632 A.2d 994 (1993), (*citing* 18 Standard Pennsylvania Practice 2d § 102:10 (1983)), *petition for allowance of appeal denied,* 537 Pa. 635, 642 A.2d 488 (1994). Once the scire facias has been issued, pursuant to Section 14 of the Municipal Claims Law, 53 P.S. § 7182, the taxpayer may file an affidavit of defense raising all defenses he may have to the municipal lien. *Shapiro; LCN Real Estate, Inc. v. Borough of Wyoming,* 117 Pa.Cmwlth. 260, 544 A.2d 1053 (1988). Section 14 of the Municipal Claims Law, 53 P.S. § 7182, provides:

Any defendant named in the claim, or any person allowed to intervene and defend there against, may, at any stage of the proceedings, present his petition, under oath or affirmation, setting forth that he has a defense in whole or in part thereto, and of what it consists; and praying that a rule be granted upon the claimant to file an affidavit of the amount claimed by him, and to show cause why the petitioner should not have leave to pay money into court; and, in the case of a municipal claim, to enter security in lieu of the claim; whereupon a rule shall be granted as prayed for. Upon the pleadings filed, or from the claim and the affidavit of defense, and without a petition where an affidavit of defense has been filed, the court shall determine how much of the claim is admitted or not sufficiently denied; and shall enter a decree that upon payment by such petitioner to the claimant of the amount thus found to be due, with interest and costs if anything be found to be due, or upon payment into court, if the claimant refuses to accept the same, and

upon payment into court of a sum sufficient to cover the balance claimed, with interest and costs, or upon the entry of approved security in the case of a municipal claim, that such claim shall be wholly discharged as a lien against the property described therein, and shall be stricken from the judgment index. Thereafter the material, disputed facts, if any, shall be tried by a jury, without further pleadings, with the same effect as if a writ of scire facias had duly issued upon said claim, to recover the balance thereof; but the jury shall be sworn to try the issues between the claimant and the parties who paid the fund into court or entered security, and verdict, judgment and payment, or execution, shall follow as in other cases. The same course may be pursued, at the instance of any owner, where the claim has not in fact been filed, and if, in that event, the petitioner complies with the decree made, the money paid into court or security entered shall stand in lieu of the claim and the latter shall not be filed, and if filed shall be stricken off upon motion.

Under this section, the court determines if the taxpayer owes any interest or costs associated with the lien.

■ While normally, equity is divested of jurisdiction where there is a prescribed statutory remedy such as this one, that is not always the case where the remedy is deemed inadequate. In *Hill v. Nationwide Insurance Company,* 391 Pa.Super. 184, 570 A.2d 574, 575–576 (1990), *petition for allowance of appeal denied,* 525 Pa. 647, 581 A.2d 573 (1990), the Superior Court explained:

"Generally, where the legislature provides a statutory remedy which is man-

---

**8.** A "scire facias sur municipal claim" is defined as a writ authorized to be issued as a means of enforcing payment of a municipal claim out of the real estate upon which such claim is a lien. Blacks Law Dictionary 1208 (5th ed.1979).

datory and exclusive, equity is without power to act, and a jurisdictional question is presented." *DeLuca v. Buckeye Coal Co.*, 463 Pa. 513, 519, 345 A.2d 637, 640 (1975). However, it has also been recognized that a "court of equity has the power to afford relief despite the existence of a legal remedy when, from the nature and complications of a given case, justice can best be reached by means of equity's flexible machinery." *Peitzman[ v. Seidman]*, 285 Pa.Super. [228] at 234 n. 4, 427 A.2d [196] at 199 n. 4. This proposition is equally true where the legal remedy is provided by statute. *Id; Pennsylvania State Chamber of Commerce v. Torquato*, 386 Pa. 306, 125 A.2d 755 (1956), *cert. denied sub nom. Bowman v. Pennsylvania State Chamber of Commerce*, 352 U.S. 1024, 77 S.Ct. 589, 1 L.Ed.2d 596 (1957). As the *Torquato* court noted:

"To induce equity to refuse its aid to a suitor, it is not sufficient that he may have some remedy at law. *An existing remedy at law* to induce equity to decline the exercise of its jurisdiction in favor of a suitor *must be an adequate and complete one.* And when from the nature and complications of a given case, its justice can best be reached, by means of the flexible machinery of a court of equity, in short where a full, perfect and complete remedy cannot be afforded at law, equity extends its jurisdiction in furtherance of justice." (Emphasis in original.)

Equity likewise has jurisdiction to protect by injunction or appropriate remedy (a) property rights, and (b) personal rights "where a multiplicity of suits may be prevented or where a fundamental question of legal right is involved," and where the interests of justice require equitable relief. *Id.* at 329, 125 A.2d at 766 (emphasis added) (citations omitted.)

Thus, to determine whether equity jurisdiction is proper in the face of an existing legal or statutory remedy, we must determine if the legal or statutory remedy available to the plaintiff is adequate and complete. And such a remedy is clearly not adequate and complete where, because of the continuing nature of the plaintiff's injury, the plaintiff would be required to bring a succession of legal actions. *Id.; see also Luitweiler v. Northchester Corporation,* 456 Pa. 530, 319 A.2d 899 (1974); *Northeast Women's Center, Inc. v. McMonagle,* 665 F.Supp. 1147, 1153 (E.D.Pa.1987).

In making that determination of whether the remedy is adequate, our Supreme Court in *Borough of Green Tree v. Board of Property Assessments, Appeals and Review,* 459 Pa. 268, 278, 328 A.2d 819, 824 (1974) (plurality decision) stated:

The approach customarily taken by this Court in the past, when faced with a question such as the one before us today, has been to require litigants to conform with the desires of the legislature by following the statutorily-prescribed route of appeal. We have, however, at the same time recognized that the above rule is not to be unthinkingly applied, but rather that exception will be made where the statutory remedy is pointless or inadequate. *Rochester[ & Pittsburgh Coal Co. v. Bd. of Assessment & Revision], supra[,* 438 Pa. 506, 266 A.2d 78 (1970)]; *Studio Theatres, Inc. v. City of Pittsburgh [Washington], supra,* 418 Pa. [73] at 79, 209 A.2d [802] at 805–806 [1965] ("Whether a court of equity, having such jurisdiction to act, should act in view of the presence of an adequate remedy at law or for same other valid reason is another matter altogether"); *Bliss Excavating Co. v. Luzerne County,* 418 Pa. 446, 451, 211 A.2d 532, 535 (1965) ("The statutory procedure need not be followed only if it is

inadequate to the task of resolving plaintiffs' objections or its pursuit will cause them irreparable harm"); *Pennsylvania Life Ins. Co. v. Pennsylvania National Life Ins. Co.*, 417 Pa. 168, 173, 208 A.2d 780, 783 (1965) ("Equity will afford relief if the statutory remedy is inadequate or its pursuit would work irreparable harm"); *Philadelphia Life Ins. Co. v. Commonwealth*, 410 Pa. 571, 580, 581, 190 A.2d 111, 116 (1963) ("the remedy must be adequate and complete; it is not adequate Where a challenge is made not to the mechanics of tax calculations but to the power of the legislature to levy any tax ..."); *Y.M.C.A. v. Reading*, 402 Pa. 592, 595, 167 A.2d 469, 471 (1961) ("The efficacy of the rule that a statutory remedy must be pursued, if one exists, is hardly questionable"). Our approach has been, in effect, a flexible one, such as that advocated by Prof. Jaffe: "Where the administrative process has nothing to contribute to the decision of the issue and there are no special reasons for postponing its immediate decision, exhaustion should not be required." L. Jaffe, Judicial Control of Administrative Action 440 (1965). [Footnotes omitted.]

■ While a taxpayer would have to follow the prescribed statutory remedy if it desired to challenge the calculation of costs and interest charged by a municipality prior to paying those costs, along with

the taxes owed,[9] we believe that an exception to that rule exists here as our Supreme Court countenanced in *Green Tree*. What is involved in this case is not the calculation of interest and costs for an individual taxpayer by a municipality, but policies established by a private entity to maximize the return on its investment involving thousands of delinquent taxpayers. Because of those policies and the multitude of actions that could result, the scire facias procedure is not a full and adequate remedy and exhaustion is not required, making Delinquent Taxpayers' equity action maintainable to challenge interest and costs GLS imposed.[10]

■ The other prescribed statutory remedy found by the trial court was the remedy set forth in Section 1 of Local Taxation Law, Act of May 21, 1943, P.L. 349, *as amended,* 72 P.S. § 5566b, providing that taxpayers can seek a refund if they believe a local government has improperly received funds, in this case, the lien amount and charges associated with it in satisfying the lien. This provision is inadequate for similar reasons, but additionally because Delinquent Taxpayers are not attempting to seek a refund from the County but from GLS, a private party, who collected the interest and costs when it purchased the liens, making this provision inapplicable.[11]

9. We note that once the taxes have been paid, the lien of the tax is void. *See Gould v. McFall*, 118 Pa. 455, 12 A. 336 (1888) (one who voluntarily pays money with full knowledge or means of knowledge of all the facts without any fraud having been practiced upon him cannot recover it back by reason of the payment having been made in ignorance of the law). However, because the Delinquent Taxpayers are alleging fraud, the fact that they already paid the taxes and costs would not preclude them from going forward with their action.

10. No one contends at this stage of the proceedings that Delinquent Taxpayers are not a proper party because they already paid the liens, costs and interest.

11. Not mentioned by the trial court was Section 3 of the Municipal Claims Act, 53 P.S § 7106, which authorizes a municipality to collect counsel fees for the collection of a municipal claim and allows an owner to challenge the reasonableness of the attorney's fees imposed by petition.

Because there is no adequate remedy for Delinquent Taxpayers to challenge the costs assessed by GLS, their action in equity is maintainable.

## III.

### INTEREST

Delinquent Taxpayers contend that the trial court erred in dismissing its claim regarding interest because GLS had no authority to collect 12% interest on the unpaid face amount of its assigned liens.[12] They contend that Section 1 of the Local Taxation Law, 72 P.S. § 5648,[13] limits the collection of interest at 12% per annum to the "collector of delinquent taxes" and requires that collector to "pay the same into the county treasury;" GLS is not a tax collector and, therefore, may not collect.[14] Interestingly, Delinquent Taxpayers do not argue that GLS is precluded from charging *any* interest, but do not cite a provision that sets a different rate.

GLS counters that the Local Taxation Law does not define "collector of delinquent taxes," does not give a municipality the exclusive right to recover interest accruing as part of the unpaid tax, and it should be considered the collector of delinquent taxes because that is what it became upon the purchase of the liens. GLS also argues that because it stands in the County's shoes, it is entitled to 12% interest because the County would be entitled to that amount. GLS, however, does not even mention Section 9 of the Municipal Claims Act, *as amended,* 53 P.S. § 7143, which provides that interest on liens should not exceed 10% on a claim for taxes even though we decided that it was the Municipal Claims Act that gave the County the power to sell the liens.

As to GLS's contention that "collector of delinquent taxes" is undefined, Section 2 of the Local Taxation Law, 72 P.S. § 5652, specifically provides that the county treasurer in counties of the second class is the collector of all delinquent county taxes, interest and penalties. GLS, then, could not be considered the collector of delinquent taxes because where the act places a duty on an official, it cannot be contracted or delegated away. *State Street Bank & Trust Co. v. Common-*

---

**12.** Delinquent Taxpayers also argue that it was illegal for GLS to charge and collect a full month's interest for only a partial month of delinquency. However, because the trial court failed to address this issue, we remand to the trial court for a determination on this issue.

**13.** 72 P.S. § 5648 provides:
In counties of the second class, all county taxes after the same become delinquent, as now provided by law, shall bear interest from the time said taxes become delinquent at a rate *determined by the county commissioners* not to exceed twelve per centum per annum until paid, and it shall be the duty of the *collector of delinquent taxes* to collect such interest in addition to the tax and *pay the same into the county treasury.* (Emphasis added.)

**14.** Delinquent Taxpayers also rely on two Pennsylvania Supreme Court cases for the proposition that an assignee of a municipal claim does not enjoy the same rights as its assignor—*Philadelphia v. Taggart,* 379 Pa. 7, 108 A.2d 68 (1954) and *Philadelphia v. Egolf,* 314 Pa. 216, 171 A. 604 (1934). In *Taggart,* however, a third party had acquired a mortgage and municipal claim after the property had been sold for taxes. The Court held that only those whose claims were discharged by the tax sale had the right of redemption and did not give that right to those who acquired the claims after the sale. In *Egolf,* the third party attempting to collect on a lien had been assigned liens from the municipality's paving contractor, not the municipality itself. Because the contractor did not have any rights of the municipality and could not confer upon the third party the municipality's rights, the assignee had no greater rights than the contractor.

*wealth,* 712 A.2d 811 (Pa.Cmwlth.1998) (contract between government and private party must not bargain away essential government powers); *Weatherly v. Warner,* 148 Pa.Super. 557, 25 A.2d 831 (1942) (municipal legislature cannot delegate its powers).

There is support, however, for GLS's position that it is entitled to collect the same rate of interest as the assigning county, citing the decision of the United States Court of Appeal for the Third Circuit in *Rankin v. DeSarno,* 89 F.3d 1123 (3d Cir.1996), *cert. denied,* 519 U.S. 1108, 117 S.Ct. 943, 136 L.Ed.2d 832 (1997). In that case, bankruptcy debtors owing tax liens to Allegheny County appealed the prepetition interest rate of 12% to which the County was entitled in connection with their tax claims arguing that the County was only entitled to a maximum interest rate of 10%. The Court of Appeals explained that while Section 9 of the Municipal Claims Act, 53 P.S. § 7143,[15] provided that interest claims made by municipalities for unpaid taxes could not exceed 10%, that section was not controlling. Instead, Section 1 of the Local Taxation Law, 72 P.S. § 5648, which allowed for an interest rate of 12% on all county tax delinquencies, was controlling, because that section specifically applied to second class counties, of which Allegheny County was the only such county, and post-dated 53 P.S. § 7143. Citing rules of statutory construction, the Third Circuit held that even though the two statutes were conflicting, because 72 P.S. § 5648 was more specific, that statute controlled and Allegheny County was entitled to collect 12% interest.

Again, the Third Circuit in *Pollice v. National Tax Funding,* 225 F.3d 379 (3d Cir.2000), addressed the issue of the interest rate applicable, but in the context of whether the City of Pittsburgh, a Home Rule Municipality, could impose interest at a rate higher than the "not to exceed 10% interest rate" contained in 53 P.S. § 7143 or a 12% rate it imposed by ordinance. It held that even though the City of Pittsburgh as a Home Rule Municipality imposed a 12% rate of interest on delinquent taxes, under Section 1 of the Home Rule and Optional Plans Law, Act of December 19, 1996, P.L. 1158, 53 P.S. 2962(a)(10), it did not have the power to charge that rate because the interest rate was the 10% interest rate set forth in the Municipal Claims Act. It did so by first finding that, "[c]learly, the assessment of interest and penalties on delinquent tax obligations falls within the scope of 'collection of municipal tax claims.'" It went on to state that a Home Rule Municipality has the authority to set "rates of taxation" but that authority "does not include the authority to set interest and penalty rates on delinquent taxes. 'Rate of taxation' undoubtedly means the rate which is applied to the value of property in order to determine the amount owed; its plain meaning does not include the rate of interest or penalty on overdue tax rates." *Id.,* 225 F.3d at 391. This statement seems to infer that if the City had the power to set the rate for delinquent tax rates, then the rate would not be the 10% rate set in the Municipal Claims Act. If we were to follow the *Pollice* statement that "the assessment of interest and penalties on delinquent tax obligations falls within the scope of 'collection of municipal tax claims,'" then because 72 P.S.

**15.** In relevant part, 53 P.S. § 7143 provides that "[i]nterest as *determined by the municipality* at a rate *not to exceed ten per cent per annum* shall be collectible on all municipal claims from the date of the completion of the work after it is filed as a lien, and *on claims for taxes,* water rents or rates, lighting rates, or sewer rates from the date of the filing of the lien ..." (Emphasis added.)

§ 5648 imposes a 12% rate of interest on delinquent taxes, that would be the rate that could be imposed on the collection of tax claims.

■ Both *Pollice* and *Rankin* are problematic because they were based on the premise, as either expressly stated in *Pollice* or inferentially in *Rankin*, that a "delinquent tax" and a tax claim are the same thing, which they are not. A delinquent tax is a tax that has not been paid on time while a "delinquent tax claim" under Section 7101 of the Municipal Claims Act, 53 P.S. § 7101, "mean[s] the claim filed to recover taxes" and "filed" means docketed in the office of the Prothonotary where the property is located. *See* 53 P.S. § 7106(b). Consequently, although we agree with the Third Circuit decision in *Rankin* that 72 P.S. § 5648 is later in time and specifically applies to counties of the second class, because 53 P.S. § 7143 deals with tax claims while the former deals with delinquent taxes—two different things—the "up to 10% rate" would apply. What GLS bought was not a delinquent tax but an *in rem* lien filed and sold under the Municipal Claims Act. In fact, when GLS bought the liens and paid the County, the underlying delinquent tax was satisfied. To be in accord with our decision in *Maierhoffer*, absent a superseding provision,[16] it would be inconsistent to say that the interest rate

set forth in the Municipal Claims Act does not apply to municipal liens.

In any event, neither of the parties has proffered any procedure for the collection of delinquent taxes by second class counties other than that contained in the Municipal Claims Act. Unless there is another provision applicable, based on our reasoning in *Maierhoffer*, the maximum amount that GLS can charge is 10% as provided for in Section 9 of the Municipal Claims Act, 53 P.S. § 7143. That rate, however, had to be set by the County Commissioners and no one has pled that a resolution or ordinance has ever been enacted that authorizes 10% or another interest rate. Because Delinquent Taxpayers never suggested that this was the appropriate rate or that the County Commissioners failed to implement the maximum rate, we vacate the trial court's order insofar as it granted Delinquent Taxpayers' request on a Motion for Judgment on the Pleadings based on its finding that that the interest rate was 12% provided for in Section 2 of the Local Taxation Law, 72 P.S. § 5652.

## IV.

### ATTORNEY'S FEES

Delinquent Taxpayers also argue that Section 3 of the Municipal Claims Act, 53

---

**16.** The reason we mention that there may be a superseding provision is because, in most instances, one exists. While the Municipal Claims Act applies to all political subdivisions, the Real Estate Tax Sale Law, Act of July 7, 1947, P.L. 1368, *as amended*, provides the method as to how taxes are to be calculated on real property tax liens for all counties, except, at present, first and second class counties. Section 205 of the Real Estate Tax Sale Law, 72 P.S. § 5860.205, applies to most political subdivisions through the creation of a tax claim bureau by the county in which they are located to collect their real property taxes. It provides that interest should be calculated on the rate of the underlying tax, not

the underlying lien. Unfortunately, while that Act initially applied to second class counties such as Allegheny County, in 1981, second class counties were specifically excluded by the Act of September 26, 1981, P.L. 274. We also note that prior to the exclusion of second class counties, the Real Estate Tax Sale Law was amended in 1949 to allow for counties to opt out of the Act and, in any year after 1948, to elect to collect delinquent taxes under the provision of the prior law pursuant to a resolution adopted by the county commissioners. Whether Allegheny County ever elected to adopt such a resolution in 1948 or thereafter is not in the record.

P.S. § 7106(a.1),[17] gives GLS no authority to charge and collect its own attorney's fee from taxpayers because attorney's fees may only be collected when they are incurred in the representation of a municipality, and GLS was acting as a private entity, not as a representative of the municipality.[18] They also argue that under that statute, where an owner disagrees with the amount of attorney's fees, the owner may challenge those fees by filing a petition in the court of common pleas in the county where the property is located. If this provision applies and if GLS succeeds to the County's rights under Section 3 of the Municipal Claims Act, 53 P.S. § 7106(a.1), because it provides a specific remedy for challenging of attorney's fees incurred by the political subdivision in collecting the municipal claim, we would dismiss that portion of Delinquent Taxpayers' claim because that procedure provides a mandatory and exclusive method of challenging the imposition of counsel fees.

Whether GLS was entitled to collect attorney's fees hinges on the rights GLS acquired once it purchased the liens. If GLS had purchased a municipal claim, say for the abatement of a nuisance, it would arguably have the right to impose counsel fees in accordance with the County's fees schedule. Section 3 of the Municipal Claims Act, 53 P.S. § 7106, however, provides that attorney's fees can be imposed on:

(a) All municipal claims which may hereafter be lawfully imposed or assessed on any property in this Commonwealth, and all such claims heretofore lawfully imposed or assessed within six months before the passage of this act and not yet liened, in the manner and to the extent hereinafter set forth, shall be and they are hereby declared to be a lien on said property, together with all

---

17. 53 P.S. § 7106(a.1) provides, in relevant part:

It is not the intent of this subsection to require owners to pay, or municipalities to sanction, inappropriate or unreasonable attorney fees, charges or expenses for routine functions. *Attorney fees incurred in the collection of any delinquent account shall be in an amount sufficient to compensate attorneys undertaking collection and representation of a municipality in actions involving claims arising under this act.* A municipality by ordinance, or by resolution if the municipality is of a class which does not have the power to enact an ordinance, shall adopt the schedule of attorney fees. Where attorney fees are sought to be collected in connection with the collection of a delinquent account, the owner may petition the court of common pleas in the county where the property subject to the municipal claim and lien is located to adjudicate the reasonableness of the attorney fees imposed. In the event that there is a challenge to the reasonableness of the attorney fees imposed in accordance with this section, the court shall consider, but not be limited to, the following:

(1) The time and labor required, the novelty and difficulty of the questions involved and the skill requisite to properly undertake collection and representation of a municipality in actions arising under subsection (a).

(2) The customary charges of the members of the bar for similar services.

(3) The amount of the delinquent account collected and the benefit to the municipality from the services.

(4) The contingency or the certainty of the compensation.
(Emphasis added.)

18. It also argues that attorney's fees cannot be imposed because when the County enacted an ordinance imposing counsel fees, it failed to properly advertise, did not supply copies of full text to the County law library, and it was not properly recorded in the County's ordinance. However, procedural challenges to the enactment of an ordinance must be raised within 30 days of the ordinance's effective date. *Municipality of Monroeville v. Prin,* 680 A.2d 9 (Pa.Cmwlth.1996). Because there is no evidence that Pentlong ever timely challenged the enactment of the ordinance, we will not address this issue.

charges, expenses, and fees incurred in the collection of any delinquent account, including reasonable attorney fees under subsection (a.1), added thereto for failure to pay promptly; and said liens shall arise when lawfully imposed and assessed and shall have priority to and be fully paid and satisfied out of the proceeds of any judicial sale of said property, before any other obligation, judgment, claim, lien, or estate with which the said property may become charged, or for which it may become liable, save and except only the costs of the sale and of the writ upon which it is made, and the taxes imposed or assessed upon said property.

As we have already noted, under *Maierhoffer*, not all provisions of the Municipal Claims Act apply to the claims that GLS purchased, but rather only those dealing with tax claims. Because Section 3 of the Municipal Claims Act, 53 P.S. § 7106, only allows for the County to impose attorney's fees for municipal claims and not tax claims, the County would not be entitled under the Municipal Claims Act to collect those attorney's fees when it sought to collect liens filed for a delinquent tax claim.[19] Because the rights of an assignee rise no higher than those of its assignor, *Commonwealth v. Lubrizol Corp. Emple. Benefit Plan*, 737 A.2d 862, n. 11 (Pa.Cmwlth.1999), GLS did not acquire any right to receive attorney's fees to collect tax liens because the County did not have such a right.[20]

## V.

## COSTS

Delinquent Taxpayers also contend that it was illegal for GLS to charge and collect "costs" from taxpayers that neither it nor the County ever paid and were essentially costs of doing business. Specifically, they contend that assignment costs and revival costs were not paid by either the County or GLS, and Section 2 of the Municipal Claims Act, 53 P.S. § 7103, only allows the collection of "charges, expenses, and fees" that were *actually* paid in collecting on the face amount of any unpaid tax claim, not for costs incurred. GLS, however, argues that it is entitled to collect a lien satisfaction fee, filing fee, transfer/assignment fee and a lien revival fee because those fees were paid by the County prior to the assignments to GLS.[21]

It appears that there are two types of costs at issue. One type being challenged is a "record cost", i.e., a cost to docket the lien in the Prothonotary's office that Delinquent Taxpayers are saying is not chargeable to them. These costs include a) the revival-of-lien cost because liens need not be revived every year, yet Delinquent Taxpayers were charged a revival fee for each

---

19. We note, though, that the provision for attorney's fees in the collection of delinquent taxes was added in 1966 by the Act of February 1, 1966, P.L. 1656, 53 P.S. § 48401.

20. We note Section 501 of the Real Estate Tax Sale Act, 72 P.S. § 5860.501, provides that the property owner is only required to pay all outstanding tax claims with interest and all other accrued unpaid taxes and record costs. It appears to envision that the 5% penalty on the tax will pay for the costs of collection, including attorney's fees. Section 207 of the Real Estate Tax Sale Act, 72 P.S. § 5860.207, also provides a schedule of fees that can be imposed in addition to record costs imposed by the County.

21. GLS indicates in its brief that for each lien from 1988 through 1993, it charged a lien filing fee of $10; a satisfaction fee of $5; a transfer/assignment fee of $15; and a 1997 lien revival fee of $25. For each lien from 1994 and thereafter, it charged a lien filing fee of $10; a satisfaction fee of $10; a transfer/assignment fee of $15; and a 1997 lien revival fee of $25.

of the three years it was delinquent, and b) the transfer-of-lien cost because the transfer of liens to GLS was not a cost that the County had to incur. The second type of "costs" at issue appears to be charges that GLS says it can impose pursuant to Section 2 of the Municipal Claims Act, 53 P.S. § 7103, even though they were never paid by the County. While we are not totally clear on what costs GLS contends it is entitled to collect, what GLS seems to be saying is that non-record costs can be imposed if they represent costs that the Prothonotary was authorized to receive when the County filed the lien but, for some reason, the Prothonotary did not charge the County as well as other indirect costs that the County actually incurred in processing the claim.

The trial court never directly answered this issue but only stated that the Prothonotary was authorized to impose certain fees under Section 1 of the Second Class County Prothonotary Fee Act, Act of June 18, 1982, P.L. 547, 42 P.S. § 21061. While it is clear that GLS is entitled to recover all record costs that the County incurred and could legally impose if it owned the lien, 53 P.S. § 7103 only allows the collection of "charges, expenses, and fees" that were actually incurred and could have been taxed as costs. Consequently, GLS is not entitled to any costs that the County did not actually incur. Therefore, we vacate the matter for a factual finding on the nature of each cost charged to Delinquent Taxpayers for a determination of whether the County had incurred such a cost.

## VI.

### CERTIFIED PAYMENT

Delinquent Taxpayers also argue that GLS is liable for the expense incurred by them resulting from GLS's instruction on its GLS Capital Tax Lien Payoff Report that they should mail or deliver certified funds to its Pittsburgh office. They rely on our Supreme Court's holding in *Douglass v. Grace Building Co., Inc.*, 477 Pa. 289, 383 A.2d 937 (1978), that Bucks County could not require a delinquent taxpayer to remit its taxes only by "cash, money order or certified check" and that payment by an uncertified personal check was permissible because the legislature had not designated in what form payment had to be made. GLS, however, argues that it did not *require* taxpayers to pay by certified or cashier's check but simply *requested* payment by that method and, in fact, accepted personal checks from taxpayers, thereby complying with *Douglass*.

While it appears that, in practice, GLS now accepts payment by personal check, that is of no moment because GLS is a private entity that has purchased liens. Based on the pleadings before us, GLS is not responsible for the costs associated with Delinquent Taxpayers' form of payment.

## VII.

### CONCLUSION

Accordingly, the decision of the trial court is affirmed in part and reversed in part and the case remanded to the trial court for further determinations in accordance with this decision.

Judge LEADBETTER dissents.

### ORDER

AND NOW, this 5th day of July, 2001, the order of the trial court is affirmed in part and reversed in part, and the case is remanded to the trial court to make further findings in accordance with this decision.

Jurisdiction relinquished.