820 A.2d 1240

**PENTLONG CORPORATION, a Pennsylvania Corporation, and Weitzel, Inc., a Pennsylvania Corporation, individually and on behalf of themselves and all others similarly situated, Appellees,**

v.

**GLS CAPITAL, INC., and the County of Allegheny, Appellants.**

Supreme Court of Pennsylvania.

Argued Nov. 15, 2001.

Decided March 19, 2003.

36

Terrence F. McVerry, Byron D. Xides, George M. Janocsko, Pittsburgh, for County of Allegheny.

Margarete Emilia Pawlowski, for City and School Dist. of Philadelphia.

Barbara A. Rizzo, Washington, for Keystone Oaks and Washington School Districts.

James Arthur Baxley, Ira Weiss, Pittsburgh, for Keystone Oaks School Dist. and Borough of Castle Shannon.

David Mario Aceto, Robert L. Byer, Terry Budd, Pittsburgh, for Nat'l Tax Funding and Capital Asset Research.

Richard Stephen Matesic, Pittsburgh, Eileen D. Yacknin, for Caroline Dumm, Mary Dummer and Ruth Marcus.

Rudy Al Fabian, Bernard S. Rubb, Sewickley, for Pentlong Corp.

Stacey F. Vernallis, Michael Gerard McCabe, Pittsburgh, for GLS Capital, Inc.

Michael P. Malakoff, Richard Allen Finberg, Pittsburgh, for Class Members (Pentlong).

Evalynn Welling, Pittsburgh, for Mon Valley Unemployed Committee.

Before ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## *OPINION*

Justice NIGRO.

Appellants GLS Capital, Inc., ("GLS") and the County of Allegheny (the "County") appeal from the Commonwealth Court's order affirming in part and reversing and remanding in part the trial court's order dismissing the class action complaint brought by Appellees Pentlong Corporation ("Pentlong") and Weitzel, Inc. ("Weitzel"). At issue is what concomitant rights a municipality may assign to a private entity to which it has assigned tax liens. For the reasons that follow, we affirm in part and reverse in part the order of the Commonwealth Court.

This case arose from the County's bulk sale, through several agreements, of its title and rights to over 125,000 tax liens for over 23,800 properties located within the County.[1] On September 29, 1997, in consideration for approximately $35 million, the County entered into a Purchase and Servicing Agreement with GLS, in which the County assigned to GLS the tax liens that the County had filed with the Prothonotary prior to and including the 1995 tax year.[2] On December 18, 1997, in

1. The County is entitled to assess and collect property taxes on real property situated within the County. *See Local Tax Enabling Act*, 53 P.S. § 6902. Ordinarily, when a tax is levied on a property, a lien automatically attaches to the property, without any County action. *See King v. Mt. Vernon Bldg. Ass'n*, 106 Pa. 165 (1884). In order to perfect the tax lien, however, the County must file a tax claim with the Prothonotary on or before the last calendar day of the third calendar year in which the tax became due and payable. 53 P.S. § 7143. The tax lien is the transferable statutorily created asset that has been collateralized by the delinquent taxpayer's real property. *See* BLACK's LAW DICTIONARY 1459 (6th ed.1990).

2. Specifically, Article II, Section 2.1 of the Purchase and Servicing Agreement provides:

Subject to the terms and conditions of this Agreement, the Seller hereby agrees to transfer, and the Purchaser hereby agrees to purchase, without recourse, representation or warranty, except as provided herein, all right, title and interest of the Seller in and to the Tax Lien Portfolio including all rights provided by applicable Laws for

consideration for approximately $2.4 million, the County entered into a 1996 Subsequent Liens Purchase and Servicing Agreement with GLS, in which the County assigned to GLS 15,213 tax liens for the 1996 tax year.[3] On September 30, 1998, the County amended the September 29 and December 18 agreements to provide for the assignment of additional tax liens for the 1997 tax years to GLS in consideration for approximately $4 million. The County and GLS also entered into a Vacant Land Purchase and Servicing Agreement, in which the County assigned to GLS tax liens for the 1998 tax year in consideration for approximately $4.3 million.[4] When GLS began collecting on the tax liens pursuant to these Agreements, it required taxpayers to pay by certified funds the face amount of the tax, plus penalties, twelve percent interest, and counsel fees, as well as filing, satisfaction, assignment, and revival fees.[5]

Appellee Pentlong, a record owner of real property situated within the County, failed to pay full property taxes for three calendar years between 1994 and 1997. The County filed tax liens against the property, which were later assigned to GLS pursuant to the Agreements. On March 16, 1998, Pentlong received a GLS Capital Tax Lien Payoff Report (the "Pentlong Report") from GLS, indicating that: the face amount owed on the tax liens was $1,252.89; interest had accrued on the unpaid taxes in the amount of $281.99; penalties totaled

collection and enforcement of such Tax Liens.... In consideration for the transfer of the Tax Lien Portfolio by the Seller to the Purchaser, the Purchaser agrees to pay the Seller on the Closing Date an amount equal to 96.0058% of the aggregate Face Value of the Tax Liens listed on the Tax Lien Schedule (the "Purchase Price").

3. In this subsequent agreement, GLS agreed to pay the County the entire aggregate tax lien amount, plus six months of accrued interest at one percent per month. The Certification of Value of Tax Lien Portfolio, however, indicates that GLS paid the County six percent interest, plus a five percent penalty.

4. We will refer collectively to these four agreements between GLS and the County as "the Agreements."

5. GLS calculated the accrued interest by charging interest for the entire month in which payment was made in full, regardless of the date of full payment. Since September 29, 1997, GLS has received payment in full for over 20,000 tax liens.

$32.76; and additional costs totaled $180, or $60 for each of the three years that Pentlong had owed taxes. The Pentlong Report included instructions that payment had to be made by certified funds to GLS's Pittsburgh office before the end of March 1998 to avoid an additional monthly penalty of $12.53, or one percent of the face amount of the tax lien. On March 18, 1998, under protest, Pentlong paid the full amount owed on the tax liens, including added interest calculated at a twelve percent per annum rate, which GLS assessed through the end of March 1998.

Appellee Weitzel, also a record owner of real property situated within the County, failed to pay property taxes for seven calendar years between 1988 and 1995. The County filed tax liens against Weitzel's property, which were later assigned to GLS. On May 21, 1998, GLS sent Weitzel a letter with an attachment (the "Weitzel Report"), stating that the liens, interest, costs, fees, and expenses owed to GLS totaled $17,572.73. The letter demanded that Weitzel promptly pay the total amount due by certified funds or GLS would satisfy the debt through a sheriff's sale of Weitzel's property at 10 a.m. on June 1, 1998. The Weitzel Report itemized lien-servicing of $55 per year for the tax years 1988, 1989, 1990, 1992, and 1993, and $60 per year for the tax years 1994 and 1995, which totaled $395 for all seven years. The Weitzel Report also indicated that GLS had added $2,829.59 in fees and expenses, which included counsel fees, and $1,229.50 in execution costs. The Weitzel Report additionally provided that the total accrued interest was computed at a twelve percent per annum rate. On June 1, 1998, prior to the commencement of the sheriff's sale, Weitzel paid the full amount owed under protest.

On April 3, 1998, Pentlong filed a class action complaint against GLS on behalf of all County property owners whose real property had been encumbered by tax liens for delinquent County property taxes and who had been assessed or billed for certain allegedly improper charges by GLS or had paid such charges to GLS pursuant to the Agreements (collectively, "Taxpayers"). In Count I of their complaint, Taxpayers al-

leged that GLS had been unjustly enriched because: (1) GLS was not entitled to collect twelve percent per annum interest on the unpaid face amount of its assigned liens; (2) GLS was not entitled to collect a full month's interest for only a partial month's delinquency; (3) GLS was not entitled to collect counsel fees; (4) GLS was not entitled to collect unrecorded costs from taxpayers, including filing, satisfaction, assignment, and revival fees; and (5) GLS was liable to Taxpayers for the costs they incurred resulting from GLS's requirement that Taxpayers pay off the tax liens by certified funds. In Count II of their complaint, Taxpayers alleged that GLS was guilty of a fraudulent scheme to assess, bill, and collect unauthorized amounts. Taxpayers sought declaratory and injunctive relief, the imposition of a constructive trust, an accounting, and damages.

GLS filed preliminary objections, arguing that Taxpayers' complaint failed to state an unjust enrichment claim and asking the trial court to strike the claims related to GLS's request for payment by certified funds, because Pentlong did not pay GLS by certified funds and, therefore, could not challenge the validity of this payment method. Although the trial court denied GLS's preliminary objections for failing to state a claim, it granted GLS's motion to strike. At the same time, however, the trial court granted Taxpayers leave to amend the complaint, and on October 26, 1998, Taxpayers filed an amended complaint, adding Weitzel, who had paid GLS by certified funds, as a representative plaintiff. On November 17, 1998, GLS filed preliminary objections to the amended complaint, but before the trial court ruled on those objections, on December 7, 1998, Taxpayers filed a second amended complaint. On October 18, 1999, the County filed a petition to intervene as a defendant, which the trial court subsequently granted.[6]

6. In its intervenor petition, the County argued that this action was a challenge to its authority to assign and transfer tax liens to a third party, and that it was best situated to assert its rights as a tax lienholder. We note that although the County is a party to this action, Taxpayers are not seeking a remedy against the County.

After GLS and the County filed answers to the second amended complaint and the trial court closed the pleadings, GLS and the County filed motions for judgment on the pleadings. Taxpayers subsequently filed a cross-motion for partial judgment on the pleadings. Following three weeks of briefing and argument, on August 14, 2000, the trial court granted GLS's motion and dismissed the complaint with prejudice.[7] The court found that Taxpayers could not proceed as an equitable class action, because they had failed to exhaust their statutory remedies under Sections 7182 and 7184 of the Municipal Claims and Tax Liens Act (the "Act"), 53 P.S. §§ 7182, 7184. The trial court, nonetheless, proceeded to address the merits of Taxpayers' claim and found that the Act permitted the assignment of all of the County's rights to GLS, including the right to charge penalties, twelve percent interest, costs, revival fees, and reasonable counsel fees.

On appeal, the en banc Commonwealth Court vacated the trial court's order dismissing the case, instead finding that Taxpayers were not required to first exhaust the statutory remedies under the Act and, therefore, could proceed as an equitable class.[8] In addressing the merits of Taxpayers' claims, the Commonwealth Court agreed with the trial court that the County had the right to assign its tax liens to GLS. The court found, however, that the maximum interest rate that GLS could charge was ten percent and that GLS had no right to collect counsel fees. The court also determined that GLS was not responsible for the additional costs incurred by Taxpayers as a result of the requirement that payment be made by certified funds and remanded the matter to the trial court for factual findings to determine whether the County actually incurred each lien-docketing cost that GLS charged Taxpayers.

7. The trial court's August 14 order seemingly adopted verbatim the findings and legal conclusions that GLS and the County had submitted to the court on July 27, 2000. On August 21, 2000, GLS filed a motion for clarification with regard to the trial court's opinion, which asked the court to add further citations and admissions. On September 7, 2000, the trial court so amended its order.

8. Judge Bonnie Leadbetter filed a dissenting statement.

GLS and the County filed cross-applications for extraordinary relief with this Court, which we granted to determine whether: (1) Taxpayers could maintain this equitable class action without first pursuing the statutory remedies afforded by the Act; (2) the County had the authority to assign the concomitant rights associated with its tax liens to GLS; (3) GLS had the authority to collect twelve percent interest on the unpaid face amount of the tax liens from Taxpayers; (4) GLS had the authority to collect counsel fees from Taxpayers; and (5) GLS had the authority to collect docketing and servicing costs from Taxpayers.[9]

## I. STATUTORY REMEDIES

As a threshold matter, this Court must determine whether this action can be maintained in equity or whether, as GLS and the County maintain, Taxpayers were required to pursue a remedy at law as afforded by the Act. Ultimately, we agree with the Commonwealth Court that Taxpayers did not err in bringing this action in equity.

In most circumstances, where a legal remedy exists, a court is divested of equity jurisdiction. *See DeLuca v. Buckeye Coal Co.*, 463 Pa. 513, 345 A.2d 637, 640 (1975). However, where the legal remedy cannot afford "full, perfect and complete" relief, "equity extends its jurisdiction in the furtherance of justice." *Pennsylvania State Chamber of Commerce v. Torquato*, 386 Pa. 306, 125 A.2d 755, 766 (1956). Thus, in order to determine whether equity jurisdiction is proper in the face of an existing legal or statutory remedy, we must determine if the legal remedy available to the plaintiff is adequate and complete. *See Borough of Green Tree v. Bd. of Prop. Assessments, App. & Rev. of Allegheny County*, 459 Pa. 268, 328 A.2d 819, 823 (1974) (plurality opinion); *also Schrader v. Heath*, 408 Pa. 79, 182 A.2d 696, 698 (1962). Where, for

9. The scope of review on a dismissal from a motion for judgment on the pleadings is plenary. *See Phillips v. A–Best Products Co.*, 542 Pa. 124, 665 A.2d 1167, 1170 (1995). The appellate court must decide whether the trial court committed an error of law or whether the pleadings disclosed facts that should have gone to the jury. *See Sinn v. Burd*, 486 Pa. 146, 404 A.2d 672, 674 (1979).

instance, a legal remedy would result in a multiplicity of duplicative lawsuits and, in contrast, an action in equity would provide a tidy global resolution, this Court has found the legal remedy to be inadequate. *See Schrader*, 182 A.2d at 698.

■ Here, the only legal remedy that GLS and the County assert is available and adequate to resolve Taxpayers' claims is the Act's scire facias procedure for challenging the amount due on a lien.[10] Pursuant to Section 7184 of the Act, if a property owner disputes the amount of a lien against his property, he may request that the lienholder issue a writ of scire facias.[11] 53 P.S. § 7184. Section 7184 provides in relevant part:

> Any party named as a defendant in the claim filed, or admitted to defend there against, may file, as of course, and serve a notice upon the claimant or upon the counsel of record to issue a scire facias thereon, within fifteen days after notice to do so. If no scire facias be issued within fifteen days after the affidavit of service of notice is filed of record, the claim shall be stricken off by the court, upon motion. . . .

53 P.S. § 7184.[12] A writ of scire facias to ascertain the amount due on a lien is ordinarily requested by a property

---

**10.** Neither GLS nor the County argues that a different statutory or other legal remedy exists that is adequate in the instant case. Accordingly, we will only address the procedure that is presently at issue, *i.e.*, the scire facias procedure, and will not speculate about other possible adequate remedies.

**11.** A writ of scire facias is a purely statutory action in rem, and the term scire facias is used to designate both the writ and the proceeding. *See* BLACK'S LAW DICTIONARY 1346 (6th ed.1990). It is a mandate to the sheriff, reciting the occasion upon which it issues, directing the parties named in the writ to appear before the court on a given date, and requiring the defendant to appear and show cause why the plaintiff should not be permitted to take some step. *See* 18 STANDARD PENNSYLVANIA PRACTICE 2D § 102:10 (1983).

**12.** Although Section 7184 does not clearly state that it applies to tax claims, such as those at issue in the instant case, the preceding section, Section 7183, states that a "tax, municipal or other claim if filed within the period aforesaid, shall remain a lien upon said properties until fully paid and satisfied . . . [provided] that either a suggestion of nonpayment and an averment of default . . . be filed, either before or after judgment on the scire facias or else a writ of scire facias . . . be issued." 53 P.S.

owner to give him the opportunity to show why the lienholder should not be allowed to execute on his property.[13] *See* 18 STANDARD PENNSYLVANIA PRACTICE 2D § 102:10 (1983). After the lienholder issues the writ, the owner may file an affidavit, pursuant to Section 7182 of the Act, raising his defenses to the lien.[14] *See Shapiro v. Center Township, Butler County,* 159 Pa.Cmwlth. 82, 632 A.2d 994, 997–98 (1993). Proper defenses to the writ include actual payment of taxes, a defective claim or lien, fraud, or lack of process or notice. *See, e.g., New*

§ 7183. Thus, pursuant to Section 7183, the scire facias procedure may be used for tax claims.

13. Alternatively, a municipality may pursue a writ of scire facias without waiting for prompting from the owner. *See* 72 P.S. § 1404.

14. Section 7182 provides:

Any defendant named in the claim, or any person allowed to intervene and defend thereagainst, may, at any stage of the proceedings, present his petition, under oath or affirmation, setting forth that he has a defense in whole or in part thereto, and of what it consists; and praying that a rule be granted upon the claimant to file an affidavit of the amount claimed by him, and to show cause why the petitioner should not have leave to pay money into court; and, in the case of a municipal claim, to enter security in lieu of the claim; whereupon a rule shall be granted as prayed for. Upon the pleadings filed, or from the claim and the affidavit of defense, and without a petition where an affidavit of defense has been filed, the court shall determine how much of the claim is admitted or not sufficiently denied; and shall enter a decree that upon payment by such petitioner to the claimant of the amount thus found to be due, with interest and costs if anything be found to be due, or upon payment into court, if the claimant refuses to accept the same, and upon payment into court of a sum sufficient to cover the balance claimed, with interest and costs, or upon the entry of approved security in the case of a municipal claim, that such claim shall be wholly discharged as a lien against the property described therein, and shall be stricken from the judgment index. Thereafter the material, disputed facts, if any, shall be tried by a jury, without further pleadings, with the same effect as if a writ of scire facias had duly issued upon said claim, to recover the balance thereof; but the jury shall be sworn to try the issues between the claimant and the parties who paid the fund into court or entered security, and verdict, judgment and payment, or execution, shall follow as in other cases. The same course may be pursued, at the instance of any owner, where the claim has not in fact been filed, and if, in that event, the petitioner complies with the decree made, the money paid into court or security entered shall stand in lieu of the claim and the latter shall not be filed, and if filed shall be stricken off upon motion.

53 P.S. § 7182.

*Kensington v. Gardner,* 372 Pa. 72, 92 A.2d 685 (1952); *Commonwealth v. Turner Supply Co.,* 352 Pa. 288, 42 A.2d 598 (1945); *Harrisburg v. Baptist,* 156 Pa. 526, 27 A. 8 (1893). The trial court ultimately determines the appropriate amount of the lien, including any interest or costs. *See* 53 P.S. § 7182.

In the instant case, Taxpayers argue that the scire facias procedure outlined in the Act is an inadequate method for Taxpayers to dispute the interest and costs imposed by GLS. Taxpayers therefore contend that they were not required to utilize the scire facias procedure either instead of or before filing the instant equity claim. We agree.

As stated above, the scire facias procedure is primarily designed as a mechanism by which individual parties may establish a complete factual record from which a fact-finder can ascertain the total amount due on a lien. *See* STANDARD PENNSYLVANIA PRACTICE 2D § 102:10 (1983). More specifically, the procedure gives allegedly delinquent taxpayers a forum in which to challenge a municipality's execution on a lien by presenting evidence in support of various factual defenses, such as actual payment, lien defects, and lack of process. As such, scire facias proceedings are primarily designed to resolve routine lien challenges.

The instant case, however, is not, as the Commonwealth Court noted, about a municipality's calculation of interest and costs for an individual taxpayer, but rather involves widespread challenges to the collection policies of a private entity that has purchased tax liens from a municipality and seeks to maximize the return on its investment. *Pentlong Corp. v. GLS Capital, Inc.,* 780 A.2d 734, 743 (Pa.Commw.2001). In particular, this case calls for judicial declarations regarding the rights of private parties to whom a municipality has assigned its tax liens. Such matters are completely foreign to the scire facias procedure. With their distinct factual focus, scire facias proceedings are simply ill-suited for the resolution of the novel and purely legal challenges presented here. Moreover, even if the thousands of delinquent taxpayers affected by GLS's collection policies were able to have their legal challenges to GLS's authority resolved through the scire

facias procedure, they would have to do so individually in piecemeal litigation, which not only is inefficient, but is also likely to yield inconsistent results. *See Schrader,* 182 A.2d at 698 (equitable relief available to prevent duplicative lawsuits). Thus, we conclude that, in the instant case, the scire facias procedure is simply inadequate to address the significant and pervasive legal issues raised by Taxpayers and, therefore, does not afford a "full, perfect and complete remedy" at law.[15] *Torquato,* 125 A.2d at 766. Taxpayers' action in equity was therefore maintainable to challenge the interest, fees, and costs that GLS imposed, and, accordingly, the Commonwealth Court properly examined the merits of Taxpayers' claims.[16]

## II. CONCOMITANT RIGHTS TO LIEN ASSIGNMENT

GLS's and the County's primary argument on appeal is that the Commonwealth Court erred in limiting GLS's concomitant rights associated with the tax liens, including the

15. GLS and the County also argue that Pentlong has no right to bring these claims on behalf of a class without an independent basis for equity jurisdiction for each individual plaintiff. *See Lilian v. Commonwealth,* 467 Pa. 15, 354 A.2d 250, 253–54 (1976) ("With no independent basis for equity jurisdiction appellants cannot generate it simply by alleging class status."). However, given our conclusion that the scire facias procedure is inadequate to address the legal issues involved in this case, we also conclude that each individual delinquent taxpayer had an independent basis for equity jurisdiction. Accordingly, GLS's and the County's claims fail.

16. Although the parties do not raise the issue, we recognize that this Court has previously stated that the only tax cases that could be brought in equity were those raising constitutional challenges to a municipality's power to tax. *See, e.g., Young Men's Christian Ass'n of the City of Reading v. City of Reading,* 402 Pa. 592, 167 A.2d 469, 472 (1961). Such a limitation is, in general, an effective means to prevent taxpayers from bringing equity actions for mere overassessment, in circumvention of adequate statutory remedies. *See Philadelphia Life Ins. Co. v. Commonwealth,* 410 Pa. 571, 190 A.2d 111, 116 (1963) (statutory remedy is adequate where only claim is overassessment). The instant case, however, like cases raising constitutional challenges to a municipality's power to tax, cannot be deemed a challenge to mere overassessment. Accordingly, we conclude that insofar as the current statutory challenges raise important and widespread issues regarding a private entity's authority to collect taxes, they too may be brought in equity. *See Borough of Green Tree,* 328 A.2d at 824 (endorsing a relatively flexible approach in determining whether jurisdiction lies in equity).

right to collect incidental charges, interest, counsel fees, and costs.[17] Taxpayers contend that the County does not have the authority to assign to private entities, such as GLS, the right to utilize the procedures set forth within the Act to collect from taxpayers interest, counsel fees, and costs, because once a private entity purchases the liens, both the liens and the collection process become privatized.[18] Accordingly, Taxpayers assert that GLS was only entitled to the rights that any

17. The issue of whether the County had the authority under the Act to assign its tax liens to GLS in the first place is not before us. Although Taxpayers attempt to argue in their brief that the County did not have such authority, they did not appeal the Commonwealth Court's decision and thus, did not seek review of the court's conclusion that the County was authorized under the Act to assign its tax liens. As such, Taxpayers cannot now challenge that conclusion. *See Pennsylvania Human Relations Comm'n v. Chester Hous. Auth.*, 458 Pa. 67, 327 A.2d 335, 338 n. 12 (1974)(appellee, who fails to cross-appeal, is precluded from raising issues decided adversely to it). Moreover, we note that in *Maierhoffer v. GLS Capital, Inc.*, 730 A.2d 547, 550–51 (Pa.Commw.1999), the Commonwealth Court held that a municipality is empowered under the Act to assign its tax claims to third parties and the Commonwealth Court below correctly relied on *Maierhoffer* in analyzing the rights of GLS and the County in the instant case. Accordingly, in this case, we consider only whether the County could assign the concomitant rights associated with the tax liens and, if so, the extent of those rights.

Taxpayers also attempt to argue in their brief to this Court that the Act violates the Pennsylvania Constitution. Specifically, they maintain that allowing the County to assign tax claims to GLS effectively sanctions the delegation of the state's taxing authority to a private entity, in contravention of Article 2, Section 1 of the Pennsylvania Constitution. However, a statute is presumed to be constitutional and will not be declared unconstitutional unless it clearly, palpably, and plainly violates the Constitution. *Commonwealth, Dep't of Transp. v. McCafferty*, 563 Pa. 146, 758 A.2d 1155, 1160 (2000) (citing *Commonwealth v. Hendrickson*, 555 Pa. 277, 724 A.2d 315 (1999)). We will not disturb this presumption unless it is properly challenged. In the instant case, Taxpayers failed to argue that the Act is unconstitutional on appeal to the Commonwealth Court, and therefore, this argument has been waived. *See* Pa.R.A.P. 302(a).

18. In the Agreements, the County clearly intended to assign to GLS its right to collect penalties, interest, costs, fees, and expenses. The Purchase and Servicing Agreement provides that: "Seller hereby agrees to transfer ... all right[s, title,] and interest of the Seller in and to the Tax Lien Portfolio including all rights provided by applicable Laws of collection and enforcement of such Tax Liens." Article I, Section 1.1 of the Purchase and Servicing Agreement also defines "tax liens" to "include penalties, interest, costs, fees and expenses on the Tax Liens as allowed by applicable Laws."

private party would have to collect on the tax liens, and as such, the County was prohibited from assigning its rights under the Act to collect interest, counsel fees, and costs to GLS.[19]

Taxpayers' argument, however, flies in the face of the plain language of the Act, which states that the "assignee shall have **all the rights** of the original holder thereof." 53 P.S. § 7147 (emphasis added). Thus, the very text of the Act clearly provides that in assigning the tax liens, the County transferred not only the liens, but also the concomitant rights accompanying those liens. Nevertheless, although we conclude that the County has the general authority to assign its concomitant rights, we must still review the parties' claims relating to each particular concomitant right assigned to GLS, *i.e.*, interest, counsel fees, and costs, to determine whether the County itself had the statutory authority to collect each penalty and, therefore, whether the County could validly assign the right to collect each penalty to GLS.[20]

**19.** Taxpayers cite to this Court's holdings in *City of Phila. v. Egolf*, 314 Pa. 216, 171 A. 604 (1934), and *City of Phila. v. Taggart*, 379 Pa. 7, 108 A.2d 68 (1954), as support for their position. In *Taggart* and *Egolf*, this Court ruled that assignees of use-plaintiffs, *i.e.*, private contractors enforcing municipal claims under the Act, could not add to their assigned rights additional rights conferred only to municipalities. In *Egolf*, the assignee of a use-plaintiff filed an assumpsit action, reserved for municipalities, to recover judgments from the property owner. This Court refused to give a use-plaintiff's assignee the right to bring an assumpsit action, because that right was expressly reserved for municipalities and the assignee did not receive that right from the municipality. *Egolf*, 171 A. at 605. Similarly, in *Taggart*, the assignee purchased a municipal lien after it was discharged, but then tried to redeem the property after a sheriff's sale. Given that the assignee did not receive his rights from a municipality, this Court refused to give him the right of redemption. *Taggart*, 108 A.2d at 69. Thus, in neither *Egolf* nor *Taggart* did the assignee receive his rights directly from the municipality. Here, however, the County explicitly assigned to GLS its rights to collect and enforce the tax liens. Thus, contrary to Taxpayers' assertions, this Court's holdings in *Egolf* and *Taggart* are inapplicable to the instant case.

**20.** In its opinion, the Commonwealth Court stated that "when GLS bought the liens and paid the County, the underlying delinquent tax was satisfied." Taxpayers urge us to read the term "satisfied" as meaning complete cessation of liability for the tax, in effect arguing that the act

## A. INTEREST

 GLS and the County first argue that the Commonwealth Court erred in finding that GLS was only entitled to collect ten percent interest, pursuant to Section 7143 of the Act, as opposed to twelve percent interest, pursuant to Section 5648 of the Fiscal Code, on the unpaid face amount of the tax liens assigned to it by the County. According to GLS and the County, the County is entitled to collect and assign interest at a twelve percent per annum rate on its tax liens, pursuant to Section 5648 of the Fiscal Code, because Section 5648 was enacted later in time and is more specific than Section 7143.[21] We agree.

of assignment causes the tax claim to evaporate when the assignee pays the municipality. We disagree.

The common law has long addressed what happens when a third party to an existing obligation pays the original party entitled to payment under general assignment principles. *See generally In re Purman's Estate*, 358 Pa. 187, 56 A.2d 86, 88 (1948) (assignment is the "transfer or setting over of property, or of some right or interest therein, from one person to another, [that] unless in some way qualified, ... is properly the transfer of one whole interest in an estate, chattel, or other thing"); *also Legal Capital, L.L.C. v. Medical Prof'l Liab. Catastrophe Loss Fund*, 561 Pa. 336, 750 A.2d 299, 302 (2000). Under general assignment principles, the third party succeeds to the original obligee's rights against the party obliged to make the payment, unless the third party intended to relieve the obligor of any future obligations. The purchase of tax claims created under the Act is governed by these common law principles, and accordingly, the municipal assignor transfers its whole interest in an unpaid tax claim to its third party assignee. Thus, the claim does not evaporate upon assignment, as Taxpayers suggest, but rather simply substitutes the assignee as the new obligee.

21. In their brief to the Commonwealth Court, Taxpayers argued that Section 5648 of the Fiscal Code did not apply, but did not argue which statutory provision did in fact apply. The Commonwealth Court subsequently determined sua sponte that, pursuant to Section 7143 of the Act, the maximum amount that the County could charge on its tax liens was ten percent. However, because Taxpayers never suggested that ten percent was the appropriate rate, or that the County Council failed to implement the maximum rate, the Commonwealth Court vacated the trial court's order insofar as it granted Taxpayers' motion for judgment on the pleadings based on its finding that the applicable interest rate was twelve percent. We note that in their brief to this Court, Taxpayers again merely restate their argument to the Commonwealth Court that Section 5648 does not apply without arguing the applicability of Section 7143.

On December 29, 1981, the General Assembly amended Section 7143 of the Act to consolidate all the interest rates that had previously applied to municipal tax liens. As amended, Section 7143 states in relevant part:

> Interest as determined by the municipality at a rate not to exceed ten percent per annum shall be collectible on all municipal claims ... and on claims for taxes ... from the date of filing of the lien therefor.... Where the provisions of such other act establishes a different rate of interest for such claims or liens, the maximum rate of interest of ten percent per annum as provided for in this section shall be applicable.

*Act of May 16, 1923,* Pub.L. No. 207, § 9, *as amended,* 53 P.S. § 7143.

Prior to December 1981, however, Section 5648 of the Fiscal Code provided that the County Council could impose its own separate rate specifically for the County. Although the amendment to Section 7143 in effect superceded any rate exceeding ten percent, on May 5, 1982, the legislature amended Section 5648 to allow a higher interest rate for delinquent taxes in second-class counties, setting a maximum rate of twelve percent interest per annum.[22] *See Act of May 5, 1982,* Pub.L. No. 106, § 1, *as amended,* 72 P.S. § 5648. The amended Section 5648 provides:

> In counties of the second class, all county taxes after the same become delinquent, as now provided by law, shall bear interest from the time said taxes become delinquent at a rate determined by the county [council] not to exceed twelve [percent] per annum until paid, and it shall be the duty of the collector of delinquent taxes to collect such interest in addition to the tax and pay the same into the county treasury.

*Id.* In compliance with the newly enacted provision, on July 6, 1982, the Board of County Commissioners enacted an ordinance providing for the accrual of an interest rate not to

22. The parties do not dispute that the County is a second-class county for Section 5648 purposes.

exceed twelve percent per annum on delinquent County taxes.[23] Since 1982, pursuant to Section 5648, the County has assessed interest at a twelve percent rate.

The Pennsylvania Statutory Construction Act provides:

Whenever a general provision in a statute shall be in conflict with a special provision in the same or another statute, the two shall be construed, if possible, so that effect may be given to both. If the conflict between the two provisions is irreconcilable, the special provisions shall prevail and shall be construed as an exception to the general provision, unless the general provision shall be enacted later and it shall be the manifest intention of the General Assembly that such general provisions shall prevail.

1 Pa.C.S. § 1933.

Section 5648 of the Fiscal Code and Section 7143 of the Act are clearly inconsistent. Section 5648 specifically empowers the County Council to charge twelve percent interest upon the date of delinquency, whereas Section 7143 authorizes the County to charge a maximum rate of ten percent interest after the County files a tax claim with the Prothonotary. Although Section 5648 applies from the delinquency date until the filing date, after a claim has been filed both statutes seemingly apply and are irreconcilable. Given this conflict, we must determine whether Section 5648 of the Fiscal Code or Section 7143 of the Act is the later and more specific provision. *See* 1 Pa.C.S. § 1933. Section 5648 is clearly the later enacted of the two statutes, as it was amended in 1982, the year after Section 7143 was amended. Section 5648 is also the more specific of the two statutes, as it is limited in application to second-class counties, whereas Section 7143 applies to all municipalities. We agree with GLS and the County that Section 5648, as the later and more specific provision, controls

23. Most recently, on January 16, 2001, the County enacted Ordinance No. 4–01, clarifying that the County Council and the Chief Executive intend for the twelve percent rate to survive the change in the County's government structure from a Board of County Commissioners to a Chief Executive and a County Council. *See* County Ordinance No. 4–01.

and permits the County to charge a twelve percent interest rate.[24] *See* 1 Pa.C.S. § 1933.

The United States Court of Appeals for the Third Circuit reached this same conclusion in *Rankin v. DeSarno*, 89 F.3d 1123 (3d Cir.1996). In *Rankin*, bankruptcy debtors owing taxes to the County appealed the assessment of a twelve percent interest rate, under Section 5648 of the Fiscal Code, on their delinquent taxes both prior to and after the filing of their bankruptcy petitions. The debtors argued that, prior to their filing for bankruptcy, the County was only entitled to a maximum interest rate of ten percent pursuant to Section 7143 of the Act. The Third Circuit explained that although Section 7143 provides that interest claims made by municipalities for unpaid taxes cannot exceed ten percent, Section 7143 was not controlling. *Rankin*, 89 F.3d at 1126–27. Citing rules of statutory construction, the Third Circuit held that given the conflict in the two statutes, Section 5648 controlled as the more specific and later enacted provision, and accordingly, the County was entitled to collect twelve percent interest pursuant to Section 5648. *Id.* (citing 1 Pa.C.S. § 1933).

We therefore agree with the trial court that when the County assigned to GLS its concomitant rights associated with its tax liens, that assignment included its right to collect interest at a twelve percent per annum rate. Accordingly, we reverse that portion of the Commonwealth Court's order that determined that ten percent was the applicable interest rate.[25]

**24.** Taxpayers also argue that Section 5648 does not apply to GLS, because GLS is not a "collector of delinquent taxes" as specified in that provision. This argument, however, fails to recognize that Section 5648 makes two distinct pronouncements: (1) that taxes themselves generate interest at a rate not to exceed twelve percent, and (2) that when this interest is collected by the County, it must be paid into the County's general fund. In that second regard, Section 5648 merely directs the County, when acting as a tax collector, to deposit any collected taxes and added interest into the County's general treasury as opposed to some special fund or a County official's pocket. *See generally* Pa. Sen. J., 130th Leg., Reg. Session 733–38 (Feb. 22, 1933) (discussing legislature's attempt to abolish office of tax collector as an "abscess on the body politic in Allegheny County"); Pa. H., *Governor's Statement*, 130th Gen. Assembly (May 31, 1933) (same).

**25.** On appeal to the Commonwealth Court, Taxpayers also argued that it was illegal for GLS to charge and collect a full month's interest for

## B. COUNSEL FEES

GLS argues that the Commonwealth Court also erred in determining that GLS did not have the right to collect its own counsel fees incurred while enforcing the tax claims. Specifically, GLS asserts that because the County had the right to collect counsel fees, the County assigned this right to GLS along with the assignment of its tax claims. We disagree.

Section 7106 of the Act provides that counsel fees can be imposed on parties against whom **municipal** claims are brought, but does not speak to **tax** claims. Specifically, Section 7106 provides:

> All municipal claims which may hereafter be lawfully imposed or assessed on any property in this Commonwealth, and all such claims heretofore lawfully imposed or assessed within six months before the passage of this act and not yet liened, in the manner and to the extent hereinafter set forth, shall be and they are hereby declared to be a lien on said property, together with all charges, expenses, and fees incurred in the collection of any delinquent account, including reasonable counsel fees under subsection (a.1), added thereto for failure to pay promptly; and said liens shall arise when lawfully imposed and assessed and shall have priority to and be fully paid and satisfied out of the proceeds of any judicial sale of said property, before any other obligation, judgment, claim, lien, or estate with which the said property may become charged, or for which it may become liable, save and except only the costs of the sale and of the writ upon which it is made, and the taxes imposed or assessed upon said property.

53 P.S. § 7106(a) (emphasis added).

Historically, the legislature divided taxes into two categories: general and special taxes. *See In re Broad Street in Sewickley Borough,* 165 Pa. 475, 30 A. 1007, 1008 (1895).

only a partial month of delinquency. The Commonwealth Court remanded this issue to the trial court, because the trial court had not yet addressed it. Given that none of the parties argue that the Commonwealth Court erred in this regard, that portion of its order stands.

General taxes were levied by a municipality to pay for its expenses, compelling all citizens and property within its limits to contribute. *Id.* In exchange for their contributions, the citizens and property received no special individual benefit, but only a general societal benefit. *Id.* Special taxes, on the other hand, were levied by a municipality on certain properties to pay for improvements that only enhanced the value of the specially taxed property. *Id.*

Today, the General Assembly continues to differentiate between the legal claims arising from these two types of assessments, calling claims arising from unpaid general taxes "tax claims" and claims arising from unpaid special taxes "municipal claims." Specifically, Section 7101 of the Act defines a "tax claim" as a "claim filed to recover taxes." 53 P.S. § 7101. Meanwhile, "municipal claim" is defined by Section 7101 as a claim arising out of or resulting from a tax assessed by a municipality to recover for a taxpayer's benefits from local improvements, services supplied, work done, or improvements authorized and undertaken by the municipality, although the assessment amount is not definitely ascertained at the time of the claim and a lien has not yet been filed. *See id.; e.g., Township of W. Manchester v. Mayo,* 746 A.2d 666 (Pa.Commw.2000) (action to enforce municipal claim for refuse collection and disposal); *Chartiers Valley Sch. Dist. v. Va. Mansions Apts., Inc.,* 340 Pa.Super. 285, 489 A.2d 1381 (1985) (action to enforce municipal claim for expectancy of additional tax revenues); *City of Phila. to Use of Tony De Paul & Son v. Magnolia Cemetery Co.,* 220 Pa.Super. 424, 289 A.2d 191 (1972) (action to enforce municipal claim for paving and installing curbing). Thus, the Act makes an explicit distinction between tax claims filed as a result of unpaid general taxes, such as those at issue here, and municipal claims filed as a result of unpaid special taxes.[26]

**26.** Based solely on the definitions of tax claims and municipal claims, as stated in Section 7101 of the Act, it may appear that municipal claims are a more specific subset of general tax claims. On the other hand, based on the same language, GLS and the County argue the opposite, *i.e.,* that tax claims are in fact a subset of municipal claims. Both constructions, however, overlook the fact that the legislature

Given this clear distinction between the two types of claims, we cannot accept GLS's and the County's assertion that Section 7106's provision for the imposition of counsel fees on parties against whom **municipal** claims are brought, also applies in cases, such as this one, involving only **tax** claims. To the contrary, we find that, pursuant to the plain language of the provision, Section 7106 applies only to municipal claims and is therefore inapplicable here.[27]

In the alternative, GLS and the County argue that Sections 7187 and 7271 of the Act authorize the County to collect counsel fees here. These two sections, however, on their face, only allow the collection of counsel fees for claims in circumstances in which the County actually instituted a separate collection action against the taxpayer. In particular, Section 7187 provides:

Tax claims and municipal claims shall be prima facie evidence of the facts averred therein in all cases; and the averments in both tax and municipal claims shall be conclusive evidence of the facts averred therein, except in the

repeatedly uses both terms within the Act, often within the same provision, and periodically dictates that the two types of claims be treated differently. For example, Section 7145 of the Act discusses both tax and municipal claims, and defines property differently for each type of claim. *See* 53 P.S. § 7145. Specifically, Section 7145 provides that "[t]he property described in tax claims shall include the whole property against which the tax is levied[; t]he property described in municipal claims may include the whole contiguous property." *See also* 53 P.S. § 7109 (stating that "the estate and title of such owner or owners ... may not be exempt from taxation or municipal claims"); 53 P.S. § 7111 ("This [A]ct shall apply only to claims wherein the right to file a lien accrues after the date of its passage, and to tax claims for the years one thousand nine hundred and twenty-one, one thousand nine hundred and twenty-two, and one thousand nine hundred and twenty-three, and to municipal claims heretofore lawfully imposed or assessed within six months before the passage of this [A]ct and not liened at the time of its passage."). Given that this Court presumes that the legislature did not intend provisions of its enactments to be mere surplusage, *see Masland v. Bachman*, 473 Pa. 280, 374 A.2d 517, 523 (1977), we must assume that the legislature intended tax claims and municipal claims to be mutually exclusive and to be treated differently.

27. It is worth noting that other sections of the Act, by their explicit terms, apply exclusively to tax claims. *See* 53 P.S. §§ 7102–7104, 7109. Meanwhile, Section 7141, like Section 7106, applies exclusively to municipal claims. *See* 53 P.S. § 7141.

particulars in which those averments shall be specifically denied by the affidavit of defense, or amendment thereof duly allowed. A compulsory nonsuit, upon trial, shall be equivalent to a verdict for defendant, whether the plaintiff appeared or not. **If plaintiff recovers a verdict, upon trial, in excess of the amount admitted by the defendant in his affidavit of defense or pleadings, he shall be entitled to reasonable [counsel] fees for collection in accordance with section [7106].**

53 P.S. § 7187 (emphasis added). Similarly, Section 7271 states that "[i]f no affidavit of defense [is] filed within the time designated, judgment may be entered and damages assessed by the Prothonotary by default, for want thereof. Such assessment shall include a fee for collection to plaintiff's attorney in accordance with section [7106]." 53 P.S. § 7271. Thus, Section 7187 only permits the County to collect reasonable counsel fees if it obtains a favorable verdict at trial, and Section 7271 only authorizes the collection of counsel fees when a default judgment is obtained against the taxpayer. As neither of these circumstances is present here, Sections 7187 and 7271 do not authorize the collection of counsel fees against Taxpayers.[28] Thus, because the County did not have the right to collect counsel fees against Taxpayers absent a jury verdict or default judgment, it could not assign any greater right to GLS.[29] *See Himes v. Cameron County Construction Corp.,* 497 Pa. 637, 444 A.2d 98, 100 (1982) ("[T]he assignee succeeds no greater rights than those possessed by the assignor."). Accordingly, the Commonwealth Court properly reversed the portion of the trial court's order granting counsel fees to GLS.

**28.** Based on the language of Sections 7187 and 7271, the argument can be made that these provisions apply exclusively to municipal claims. In light of our holding that these provisions are otherwise inapplicable to the instant case, however, there remains no need to address whether a lienholder could collect counsel fees after instituting a collection action for a tax claim.

**29.** Taxpayers argue that even if GLS had the authority to charge counsel fees, Taxpayers may still litigate the reasonableness of those fees. Given our conclusion that GLS was not authorized to charge counsel fees, the issue of whether Taxpayers could litigate the reasonableness of those fees is academic.

## C. LIEN–DOCKETING COSTS

[13] Finally, GLS and the County argue that the Commonwealth Court's order remanding the lien-docketing costs issue must be reversed, because, according to GLS and the County, GLS is entitled to collect these costs as a matter of law. Specifically, GLS and the County assert that GLS is entitled to collect from Taxpayers lien assignment, filing, satisfaction, and revival fees, all of which they contend are costs that either the County incurred prior to assignment or GLS incurred post-assignment. Taxpayers contend, on the other hand, that it was illegal for GLS to collect costs that were not actually incurred or unnecessary. For the following reasons, we affirm the Commonwealth Court's decision to remand this matter, but on alternative grounds.

Section 7103 of the Act expressly provides that a municipality may collect from Taxpayers not only the face amount of a tax, but also "all charges, expenses and fees added thereto for failure to pay promptly." [30] 53 P.S. § 7103. The Second–Class County Prothonotary Fee Act ("Fee Act"), 42 P.S. § 21042, sets forth the fee types and charges that the Prothonotary of Allegheny County may charge for lien assignment, filing, satisfaction, and revival. When the County files papers for any one of these purposes, the Prothonotary records the filing on the appropriate docket and is also expected to note on the docket the statutory charge as prescribed by the Fee Act. All of the parties agree that when any such statutorily defined fee is recorded on the docket, the County is authorized pursuant to Section 7103 to collect that fee from the taxpayer as part of the delinquent tax.

As stated above, Section 7147 of the Act explicitly provides that the "assignee shall have all the rights of the original holder thereof" and in no way limits the rights that may be transferred from a municipality to its assignee. 53 P.S. § 7147. Thus, as a general rule, pursuant to Section 7147, the County has the authority to assign to GLS its right to collect

---

**30.** Likewise, Section 7231 of the Act declares that "[t]he term 'delinquent taxes and municipal claims' ... include[s the] penalties, interest and costs." 53 P.S. § 7231.

from Taxpayers statutorily established costs. This means that GLS can collect not only any costs that the County could have added to the lien prior to assignment, but also, pursuant to Section 7103, any costs that may accrue post-assignment.

Having concluded that GLS can collect the same types of costs from Taxpayers that the County could have collected had it never assigned its liens, we decline to address the parties' remaining arguments regarding lien-docketing costs, all of which require careful consideration of the facts of each individual case,[31] and none of which challenge the scope of GLS's concomitant rights associated with the tax liens that the county had assigned to it, which was the basis for our exertion of equity jurisdiction. Instead, we remand to the trial court, which as a threshold matter should determine whether the remaining claims should even be resolved in this class action.

## III. CONCLUSION

In sum, we hold that pursuant to Section 7147 of the Act, the County had the authority to assign to GLS the concomitant rights associated with the tax liens that the County held against Taxpayers' properties. Specifically, we hold that the County is entitled to collect twelve percent interest per annum and can assign to GLS that right, along with its right to collect lien assignment, satisfaction, revival, and filing costs. Accordingly, the Commonwealth Court's order is affirmed in part, reversed in part, and remanded to the trial court for proceedings consistent with this opinion. Jurisdiction relinquished.

Former Chief Justice FLAHERTY did not participate in the consideration or decision of this case.

Former Chief Justice ZAPPALA did not participate in the decision of this matter.

---

31. Among other things, the parties urge this Court to resolve numerous disputes about the exact circumstances under which a lienholder may recover costs under Section 7103.